IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAVERIA HARPER as the Personal Representative of the Estate of ARTHER MCAFEE, JR and LORINE MCAFEE, | * * * * | |
| Plaintiffs, | * * | CIVIL ACTION NO. 2:18-CV-520 |
| v. | * * * | |
| JEFF MCANDREWS AND HARRISON COUNTY, TEXAS. | * * * | |
| Defendants. | * | |

Pursuant to Fed. R. Civ. P. 26(1)(2), I, John G. Peters, Jr., Ph.D., hereby submit my preliminary report that contains a complete statement of preliminary opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the preliminary opinions the exhibits or list of references I used as a summary of or support for the preliminary opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
October 9, 2019

APPENDIX "A"

## I.      CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED: See APPENDIX A.

## II.     COMPENSATION: Appendix B

## III.    FOCUS OF ANALYSIS

Through counsel for Plaintiffs Laveria Harper (Ms. Harper) and Lorine McAfee (Ms. McAfee), I was asked to review documents produced in discovery, certain pleadings, and other documents and then analyze training standards, public safety standards, police practices, uses of force, conduct, in addition to related issues and then offer opinions about same. The analyses and opinions developed are contained within this report.

I am retained to provide expert opinions in the above areas of law enforcement practices. I am not a party to this litigation. A copy of my *Curriculum Vitae* is attached to this report, which identifies my education, professional experience, over 250 publications, and other training and experience. There are areas of my education, training, and experience that are very relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical).

I am a graduate of the TASER M26™ and X26™ ECD Instructor programs who has taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the TASER X3™ ECD instructor program, the TASER XREP™ instructor program, the TASER X12™ instructor program, the TASER AXON™ instructor program, the TASER Evidence.com program, and have authored several articles about TASER ECD and related devices.

## IV.     RIGHT TO AMEND

I reserve the right to amend and/or supplement these opinions if additional information becomes available, or in response to expert disclosures of the defendant or plaintiff, or if questions are asked of me that do not relate to information contained in this disclosure.

## V.      PRELIMINARY OPINION STANDARDS

Expressed preliminary opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## VI.    PRELIMINARY OPINION METHODOLOGY

The preliminary opinions were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study.

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## VII.    EXECUTIVE SUMMARY

1.    **Deputy McAndrews initially violated the officer safety principle of disengagement with Mr. McAfee after the initial TASER electronic control weapon (ECW) was not effective and when Mr. McAfee allegedly grabbed the ECW while on his back.**

2.    **Deputy McAndrews failed to follow TASER ECW training when he aimed at Mr. McAfee's chest area and then discharged the ECW in probe mode.**

3.    **Deputy McAndrews failed to follow TASER ECW training when he attempted to "drive stun" Mr. McAfee.**

4.    **The force used by Deputy McAndrews on Mr. McAfee was inconsistent with and violated national use-of-force standards, recommendations, and guidelines.**

5.    **The behavior of Deputy McAndrews violated the *Law Enforcement Code of Ethics*.**

6.    **Harrison County, Texas and its policymakers, Judge Taylor and Sheriff McCool, failed to guide and limit deputy discretion by developing and issueing a written policy and procedure on responding to and conducting welfare checks on individuals, thereby falling below national policy standards, recommendations, and guidelines.**

7.     **Harrison County, Texas and its policymakers purposively failed to guide and limit deputy discretion by developing and issuing a written policy and procedure on responding to and interacting with people who have mental illness and/or disabled, thereby falling below national policy standards, recommendations, and guidelines.**

8.     **Harrison County cannot train its deputies about HCSO welfare check policy and procedure because it lacked such policy, which falls below national career and technical training standards.**

9.     **Harrison County and its policymakers purposively failed to train Deputy McAndrews on how to conduct welfare checks, on how to interact with disabled individuals, and on the ADA, which falls below training standards, recommendations, and guidelines.**

10.     **Harrison County failed to use a valid, reliable, and comprehensive employee performance evaluation instrument and had a custom, practice, or policy of not including a performance improvement plan or goals for Deputy McAndrews during the next reporting period that further demonstrated the inadequate leadership and failure to supervise it deputies, and which was a material cause in Deputy McAndrews' aggression toward Mr. McAfee.**

11.     **Harrison County and its policymakers have had a custom, practice, or policy of failing to objectively, quantitatively test their officers on ECW "Drive Stun" and other psychomotor domain skills during training programs to demonstrate their proper use of an ECW, which is outside the scope of career and educational testing standards for deputies who carry a TASER.**

12.     **Harrison County and its policymakers created a Sheriff's Office organizational atmosphere that condoned unconstitutional, reckless, and dangerous behavior by its deputies.**

13.     **Harrison County and its policymakers failed to conduct a timely and objective Internal Affairs investigation into the McAfee killing that appears will result in the ratification of Deputy McAndrew's outrageous conduct and which falls below internal investigative standards, recommendations, and guidelines.**

## VIII.  DISCUSSION of PRELIMINARY OPINIONS

1.     **Deputy McAndrews initially violated the officer safety principle of disengagement with Mr. McAfee after the initial TASER electronic control weapon (ECW) was not effective and when Mr. McAfee allegedly grabbed the ECW while on his back.**

Deputy McAndrews failed to follow the officer safety principle of disengagement after it was obvious the TASER ECW was not working as intended. The principle of disengagement is predicated upon *threat assessment* by the law enforcement officer, in this case Deputy

McAndrews. As taught to officers, it is their responsibility :10 to *detect* and 20 to *control* any threat . . ." (Remsberg, 1986, p. 57).

It is clear from the investigation into the tragic death of Mr. McAfee that Deputy McAndrews had "deployed the TASER and was unsuccessful in gaining compliance" (Bates Stamp, DEF01276). Deputy McAndrews told investigators that "After firing the TASER . . . he did not know if he hit Arthur McAfee with the probes from the TASER" (DEF01283). Because Mr. McAfee did not fall to the floor in neuromuscular incapacitation (NMI) from the TASER ECW, Deputy McAndrews knew the ECW was not working as intended. At that point in time, Deputy McAndrews needed to disengage from Mr. McAfee and move into the front of the home or move outside of it. Deputy McAndrew's failure to disengage was a material reason for the fatal shooting of Mr. McAfee.

Deputy McAndrews' also failed to disengage with Mr. McAfee after there was an alleged struggle over the ECW. While trying to remove the ECW cartridge, Deputy McAndrews told investigators that Mr. McAfee "gained control of the TASER . . . the TASER X26 was now in the hand of Arthur McAfee who was controlling the TASER by the grip [using his] right hand" Bates Stamp, DEF01283-01284). Per Deputy McAndrews, the TASER ECW cartridge was deployed and therefore could not be redeployed at anyone, including Deputy McAndrews. An appropriate alternative to continuing to use force on Mr. McAfee at this point in time was to disengage from Mr. McAfee. Even if he had the ECW, it could not be redeployed using the probes and disengagement creates distance, thus rendering the ECW virtually ineffective toward anyone.

Deputy McAndrews told investigators that "he successfully disengaged" from Mr. McAfee before he "pulled his handgun from the holster" and shooting Mr. McAfee (Bates Stamp, DEF01284). While he reportedly did successfully disengage from Mr. McAfee, he remained in the same location before fatally shooting an unarmed Mr. McAfee.

**2.    Deputy McAndrews failed to follow TASER ECW training when he aimed at Mr. McAfee's chest area and then discharged the ECW in probe mode.**

Taser International, Inc. (now known as Axon Enterprises, Inc.) changed the primary target location from a human's chest area to the lower abdominal and leg areas in 2009. Deputy McAndrews told investigators "he targeted the chest area of Arthur McAfee" (Bates Stamp, DEF01283). Such targeting violated TASER ECW training, warnings, and guidelines.

3. Close-spread ECD discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region

**Back shots remain the preferred area when practical.** We believe this recommendation will improve the effective use of TASER ECDs while also further increasing safety margins and enhancing the ability to defend such cases in post event legal proceedings. (Source: TASER X26 User Course, p.24).

Deputy McAndrews' body-worn camera footage showed that he and Mr. McAfee were not that far apart when the TASER ECW was deployed, which violated ECW training. When the

deployed probes are too close to the target, the probe spread may not be very wide, thus impacting the effectiveness of the ECW.



**Deployment Distance Considerations**

Deployments from 0-7 feet (0-2 meters):

• Higher hit probability

• Limited probe spread = low amount of muscle mass affected

• Short reactionary distance

(Source: TASER X26 User Course, p. 144)

**TARGETING**

**Avoid intentionally targeting the CEW on sensitive areas of the body such as the head, throat, breast, chest or area of the heart, genitals, or known pre-existing injury areas without legal justification.**

•The preferred target areas are below the neck area for back shots and the lower center mass (below chest or heart area) for front shots

– Avoid sensitive areas

TASER User-Level PowerPoint Slide, Version 19.

Deputy McAndrews' failure to follow TASER ECW training by aiming at Mr. McAfee's chest area from a close range was a material cause in Deputy McAndrews' fatal shooting of Mr. McAfee.

> **3.    Deputy McAndrews failed to follow TASER ECW training when he attempted to "drive stun" Mr. McAfee.**

An ECW "drive stun" does not cause NMI as does a probe deployment. To use a drive stun on Mr. McAfee, Deputy McAndrews had to remove the ECW cartridge from the front of the ECW and then press the ECW contact points (located on the front of the ECW) against Mr. McAfee's body. TASER-trained law enforcement officers know that a drive stun will not cause

NMI and only cause pain. Pain will generally make the individual react to the pain and attempt to get away from it and/or push the device away from him or her. Officers are warned in ECW training not to use a drive stun on a person to gain total compliance. Deputy McAndrews multiple drive stuns to Mr. McAfee caused inappropriate pain to him given the totality of the circumstances.

Further, TASER-trained officers know from their training not to attempt to remove the ECW cartridge while physically struggling with a person while on the ground. The best way to remove a cartridge is to disengage from the person, remove it, and prepare the ECW for the next contact with a target.

The failure to follow his ECW training and/or to not disengage from Mr. McAfee appears to have resulted in Deputy McAndrews coming into contact with the ECW contacts. While struggling with Mr. McAfee, Deputy McAndrews told investigators "the TASER cycled on occasion [and he] felt the electrical cycles in his hand and legs. Arthur McAfee was cycling the TASER" (Bates Stamp, DEF01284). To quickly avoid this sensation, Deputy McAndrews simply had to disengage from Mr. McAfee and then create distance.

Based upon my education, training, and experience, it is highly unlikely that an untrained individual on ECWs such as Mr. McAfee would take away Deputy McAndrews' TASER and then deliberately used it against him as testified to by Deputy McAndrews (Defendants Objections and Answers to Plaintiffs' First Set of Written Interrogatories, Answer to Interrogatory No. 11 and 14, p. 6).

4.      **The force used by Deputy McAndrews on Mr. McAfee was inconsistent with and violated national use-of-force standards, recommendations, and guidelines.**

Law enforcement officers, like Deputy McAndrews, are taught about use of force in the law enforcement academy, and in-service, as well as other training programs authorized by their agency and the state. Officers are taught that the national standard regarding the use of deadly and non-deadly force that amounts to a 4th Amendment seizure is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the moment the force was used (Plitt, 2005, section 62).

Officers are taught, among other things, "reasonableness contemplates careful consideration of the facts and circumstances of the incident including: (1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight" (Graham v. Connor). Based upon my education, training, and experience, Mr. McAfee did not appear to have the ability to form intent because of his mental illness, and Deputy McAndrews knew Mr. McAfee had mental illness (Bates Stamp, DEF1276).

**Factor #1: Was Mr. McAfee an immediate threat to Deputy McAndrews, to others, or to himself?**

Not to others, but to himself. Mr. McAfee's scuffle with his sister was over when Deputy McAndrews tried to handcuff him.

A content analysis of the video footage showed Mr. McAfee was not an immediate threat to Deputy McAndrews after being taken to the floor. Although he appeared to react to being shocked by the TASER ECW by Deputy McAndrews, he was not able to physically harm Deputy McAndrews while the Deputy attempted to handcuff him. Reacting to an ECW shock by trying to push the ECW away is well known by law enforcement officers such as Deputy McAndrews. Deputy McAndrews reported that after removing the ECW cartridge, he drive stunned Mr. McAfee (Bates Stamp, DEF00288). Deputy McAndrews reported the drive stun had no effect on Mr. McAfee and that McAfee "then took the taser (sic) away from [him]" (DEF00288). It is a natural reaction to grabb or push away what is causing the pain.

Deputy McAndrews had not reported that Mr. McAfee tried to take his handgun until more recently, which appears to now be a predicate to justify his use of deadly force. Deputy McAndrews did not mention the gun grabbing attempt by Mr. McAfee to investigators (Bates Stamp, DEF01276, DEF01284; DEF00004; DEF00288). In his signed statement dated January 23, 2018, Deputy McAndrews did not say Mr. McAfee had attempted to grab his handgun (DEF00004), nor did he report it in a Probable Cause affidavit (DEF00288). In fact, Deputy McAndrews reported that he had totally disengaged from Mr. McAfee and that Mr. McAfee did not have his handgun.

Further evidence of this allegation not having been made until recently is the fact that a firearms laboratory test did not attempt to identify Mr. McAfee's fingerprints, skin, or palm marks on Deputy McAndrews' handgun (Bates Stamp, DEF01233).

Deputy McAndrews testified Mr. McAfee "was on his feet and in the process of standing up" (Defendant's Objections and Answers to Plaintiffs' First Set of Written Interrogatories, Answer to Interrogatory Number 15, p. 6). Surprisingly, this is the first time it was reported by anyone that Mr. McAfee was standing. Lorine McAfee, who was present when her brother, Mr. McAfee was shot and killed by Deputy McAndrews, told investigators the Mr. McAfee "was still laying on his back when he was shot" (Bates Stamp, DEF01279).

Deputy McAndrews told investigators that "he successfully disengaged" from Mr. McAfee before pulling his handgun from its holster and shooting Mr. McAfee (Bates Stamp, DEF01284). While he reportedly did successfully disengage from Mr. McAfee, he remained in the same location before fatally shooting an unarmed Mr. McAfee. Deputy McAndrews told investigators the only immediate activity by Mr. McAfee prior to being fatally shot was that he was approaching him (DEF01284). Using deadly force against an unarmed person violates national force standards, guidelines, recommendations, and agency policy.

If Mr. McAfee had control of the ECW, Deputy McAndrews reported that he "successfully disengaged" from Mr. McAfee, and therefore only had to move away from him.

The ECW cartridge had been removed and therefore it could not fire probes. As long as Deputy McAndrews remained at least arms-length away from Mr. McAfee, the ECW could not be used by McAfee. Deputy McAndrews knew from his ECW training that it was a non-lethal device, and therefore he should not have used deadly force against McAfee.

**Factor #2: Did Mr. McAfee actively resist Deputy McAndrews?**

Yes, at times, but Mr. McAfee had mental illness and may have had an inability to form intent.

Mr. McAfee appeared to be defending himself against the ECW and could not comply with Deputy McAndrews' initial command to place his hands behind the back. Body-worn camera audio at approximate time code 3:48 indicated Deputy McAndrews told Mr. McAfee to "put your hands behind your back." However, Mr. McAfee was lying on his back and therefore could not place his hands behind the back. This is confirmed at approximate time code 4:08 when Deputy McAndrews is heard saying, "Get on your stomach" three times to Mr. McAfee.

Based upon my education, training, and experience, Mr. McAfee's inability to place his hands behind the back is not actively resisting Deputy McAndrews because Mr. McAfee cannot possibly comply with the Deputy's request.

**Factor #3: What was the crime that had been committed by Mr. McAfee at the time he was seized by Deputy McAndrews?**

None, except the failure to follow verbal commands. His mental illness most likely prevented him from forming intent.

**Element: Were the circumstances surrounding the seizure of Mr. McAfee tense, uncertain, and rapidly evolving?**

No, because Deputy McAndrews reported to have totally disengaged from Mr. McAfee.

Based upon my education, training, and experience, Deputy McAndrews was controlling the pacing of the event. Had Deputy McAndrews totally disengaged, created distance, and slowed the pacing of the event, based upon my education, training, and experience, the welfare check on Mr. McAfee could have been completed very quickly. Again, Deputy McAndrews reported that he "successfully disengaged" from Mr. McAfee prior to fatally shooting him (Bates Stamp, DEF01284). Because he reported to be totally disengaged from Mr. McAfee, creating distance was a great alternative to the use of deadly force on an individual who may have been holding a non-deadly device. Fatally shooting Mr. McAfee was an inappropriate use of force by Deputy McAndrews given the totality of the circumstances and caused pain to Mr. McAfee.

It appears as if Deputy McAndrews panicked when he reportedly touched the contact points of the ECW. He knew or should have known from training that NMI would not be caused, and that Mr. McAfee needed to press and hold the device against him to create pain compliance. The use of a baton or pepper spray on Mr. McAfee were appropriate alternatives to the use of deadly force.

5.      **The behavior of Deputy McAndrews violated the *Law Enforcement Code of Ethics*.**

Deputy McAndrews' behavior violated the *Law Enforcement Code of Ethics* that is a part of the Harrison County Sheriff's Office *Standard Operating Procedures Manual* (Bates Stamp, DEF1013). The "Law Enforcement Code of Ethics" published by the International Association of Chiefs of Police (IACP). The IACP Code of Ethics reads:

"As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception; the weak against oppression or intimidation, and the peaceful against violence or disorder, and to respect the Constitutional rights of all men to liberty, equality, and justice.

"I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department.

"Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in performance of my duty.

"I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

"I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession…law enforcement" (IACP, Code of Ethics).

The original IACP Code of Ethics was written in 1957 and revised in 1989 (Grant, 2002, p. 1). The IACP also has a "Law Enforcement Oath of Honor" that reads:

"On my honor, I will never betray my badge, my integrity, my character or the public trust. I will always have the courage to hold myself and others accountable for our actions. I will always uphold the constitution, my community, and the agency I serve" (IACP, Law Enforcement Oath of Honor).

Based upon my education, training, and experience, Deputy McAndrews' behavior and/or his use-of-force on Mr. McAfee clearly violated the Law Enforcement Code of Ethics, which simultaneously violated Harrison County Sheriff's Office policy.

6.    **Harrison County, Texas and its policymakers, Judge Taylor and Sheriff McCool, failed to guide and limit deputy discretion by developing and issueing a written policy and procedure on responding to and conducting welfare checks on individuals, thereby falling below national policy standards, recommendations, and guidelines.**

A content analysis of the Harrison County Sheriff's Office (HCSO) *Standard Operating Procedures Manual* failed to identify any policy or procedure on how its deputies should respond to and conduct welfare checks on individuals (Bates Stamp, DEF01013). The 127-page manual was revised on September 13, 2016 and was in effect on January 20, 2018 (DEF01013) the day of Harrison County's Deputy McAndrews' fatal shooting of Mr. McAfee. Based upon my education, training, and experinece, it is a common practice in law enforcement that officers respond to and conduct welfare checks on individuals and for an employer, in this case Harrison County, to not have a policy or procedure to guide and limit employee discretion falls below national policy standards, recommendations, and guidelines.

"Through a police welfare check, law enforcement goes to the person's residence, usually along with the person who made the report. Law enforcement officers enter the residence to determine the safety of the individual.

"A police welfare check is a significant law enforcement function because it allows for professional intervention if an individual is in distress or need of assistance because of a health condition, injury or some other situation" (https://legalbeagle.com/5823955-police-welfare-check.html).

Contemporary and knowledgeable police administrators (e.g., Harrison County Commissioners, Judge Taylor, and Sheriff McCool) know and understand the need for written policy and procedures. Writing for the International Association of Chiefs of Police (IACP) **A Police Chief's Desk Reference** (2004), Chief W. Dwayne Orrick noted that policy and procedure manuals and directives "provides staff with the guidance necessary to perform department operations" (p. 139). Written policy and procedures regarding the use of TASER ECWs failed to promulgate and failed to exist in the instant matter,

The Commission on Accreditation for Law Enforcement Agencies (CALEA) stated that a law enforcement agency (including correctional facilities) "should establish a formal written directive system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties" (CALEA, January 1999, p. 12-2). CALEA Standard 12.2, "Written Directives" lists, at a minimum, what a written directive system must include.

The failure of Harrison County to have in place a welfare check policy and procedure contradicts its published "Vision" about law enforcement: "We will employ time-tested police methods and promising innovative approaches to better protect our communities" (Bates Stamp, DEF01016). Written policies and procedures about how to conduct welfare checks is a "time-tested police method."

Surprisingly, Harrison County devoted 27 pages of its Sheriff's Office manual to "Lineups," which accounted for 21% of the manual's content. When the manual's Table of Contents and Alphabetical Listing of topics is subtracted from the pages, the "Lineups" portion of the manual is 23% of its contents. "Lineups" are generally conducted less frequently than welfare checks.

7. **Harrison County, Texas and its policymakers purposively failed to guide and limit deputy discretion by developing and issuing a written policy and procedure on responding to and interacting with people who have mental illness and/or disabled, thereby falling below national policy standards, recommendations, and guidelines.**

A content analysis of the Harrison County Sheriff's Office (HCSO) *Standard Operating Procedures Manual* failed to identify any policy or procedure on how its deputies should respond to and interact with individuals who have mental illness and/or are disabled (Bates Stamp, DEF01013). The lack of documentation showed the Harrison County failed to have its deputies, including Deputy McAndrews, trained on how to safely capture, control, and/or restrain individuals who are experiencing mental health issues.

The content analysis also failed to identify any policy or procedure on how deputies are to interact with individuals who may be disabled per the Americans With Disabilities Act (ADA). Because many individuals who have chronic mental illness and/or who are disabled, they are protected by the ADA. Based upon my education, training, and experience as a "Public Safety Disability Specialist," Harrison County failed to promulgate an ADA policy and/or train and/or supervise its deputies about how to treat disabled individuals per the ADA.

Based upon my education, training, and experience, Harrison County knew its deputies frequently came into contact with mentally ill individuals, and further knew or should have known that it must promulgate policies and procedures to guide and limit deputy discretion. Further, deputies must be trained in the *core task* of safely, adequately, and professionally interacting with individuals who had mental health and/or disability issues. Deputy McAndrews told admitted he knew the call to which he was responding was a welfare check and possibly involved an individual who had mental health issues (Bates Stamp, DEF00004; DEF0126Defendant's Objections and Answers to Plaintiffs' First Set of Written Interrogatories, Answer to Interrogatory No. 5, p. 5).

8. **Harrison County cannot train its deputies about HCSO welfare check policy and procedure because it lacked such a policy, which falls below national career and technical training standards.**

A content analysis of Deputy McAndrew's personnel file failed to identify any training he had received from Harrison County about how to conduct welfare checks (Bates Stamp, DEF01163). It appears the primary reason for the failure to train Deputy McAndrews about the welfare check policy is based upon Harrison County's failure to have such a policy. Conducting welfare checks is a *core task* of law enforcement officers and therefore employers, such as Harrison County, must conduct training in core tasks. This failure by Harrison County to adequately train Deputy McAndrews about welfare checks was a material cause in his fatal shooting of Mr. McAfee.

This opinion may be further developed based on additional Discovery.

**9.     Harrison County and its policymakers purposively failed to train Deputy McAndrews on how to conduct welfare checks, on how to interact with disabled individuals, and on the ADA, which falls below training standards, recommendations, and guidelines.**

A content analysis of Deputy McAndrew's personnel file failed to show Harrison County had trained him on how to conduct welfare checks, on how to interact with disabled individuals, and on the ADA  (Bates Stamp, DEF01163). According to the *Standards for Law Enforcement Agencies* (November 2001),training is noted as one of the most important responsibilities and duties of a law enforcement agency. According to the Commission on Accreditation for Law Enforcement Agencies (CALEA®), "well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations" (p. 33-1).

It is well publicized in the criminal justice community and generally accepted that the employer administrator must reasonably train **employees in their core tasks** (see *City of Canton, Ohio v. Harris, et al*, 489 U.S. 378, 109. S.Ct. 1197 (1989), and its progeny) and also in **their essential skills** (*Griggs v. Duke Power Co*., 401 U.S. 424 (1971).  Contemporary and reasonable law enforcement administrators and other municipal administrators know that when they fail to conduct core training, they can be held deliberately indifferent under what one court has defined as "just not giving a damn" (*Bordanaro v. McLeod*, 871 F2d 1151, 1164 (1st Cir. 1989) or be found negligent under tort law principles and doctrines. These and similar court holdings are discussed in contemporary training courses, which contemporary and reasonable county and agency administrators and their trainers attend.

Individuals with mental health issues are found everywhere across the United States, and therefore training of law enforcement officers about mental health issues takes priority in today's environment. Often referred to as "Crisis Intervention," law enforcement agencies across the United States have incorporated mental health issues and the ADA into their core training curricula. One example is the Fresno (CA) Police Department as shown below.

**418.3 TRAINING**
*The Fresno Police Department will provide officers training on interaction with persons with mental health disabilities, welfare checks, 5150 commitments, de-escalation, tactical communication and crisis intervention (Penal Code §11106.4; Penal Code §13515.25; Penal Code §13515.27; Penal Code §13515.30).*

Source: https://www.fresno.gov/police/wp-content/uploads/sites/5/2016/09/FPD-Policy-Manual.pdf

The International Association of Chiefs of Police (IACP) has published several volumes of "Model Policies" that deal with mental health and other issues. Harrison County knew or should have known about the IACP "Model Policies" and obtained them. In addition to the IACP, there are several other law enforcement organizations that provide information about mental health issues, including, but not limited to the United States Department of Justice (DOJ), the National Institute of Justice (NIJ), and the National Association of Mental Illness (NAMI).

There are many sources from which Harrison could have obtained sample policies, mental health information, and so forth, to be placed into the Harrison County Sheriff's Office *Standard Operating Procedures Manual*.

Based upon my education, training, and experience, Harrison County and its policymakers purposely failed to follow national standards, guidelines, recommendations when it failed to have written policies, procedures, rules and/or regulations that guided and instructed its deputies about interacting with individuals who are suffering from mental illness, and may need to be involuntary committed for their safety or the safety of others.

Harrison County did know about the ADA and included it into its personnel manual, but the focus was solely limited to "Fair Employment" (Bates Stamp, DEF00872). "It is the policy of Harrison County to provide a work environment that is free of discrimination against any applicant or employee who is qualified individual with a disability" (DEF00872). The ADA policy is very specific that it does not include people whom County employees, such as Deputy McAndrews, come in contact with during the scope of their duties.

There was nothing reviewed that showed Deputy McAndrews had received training and/or was competency-based tested on verbal de-escalation techniques, even though the Harrison County Sheriff's Office Training Academy currently offers "De-escalation" training on its training calendar, but there is no evidence this is a part of in-service training or that Deputy McAndrews had received such training (https://calendar.google.com/calendar/embed?src=hcsotrainingcalendar@gmail.com&ctz=America/Chicago).

   **10.     Harrison County failed to use a valid, reliable, and comprehensive employee performance evaluation instrument and had a custom, practice, or policy of not including a performance improvement plan or goals for Deputy McAndrews during the next reporting period that further demonstrated the inadequate leadership and failure to supervise it deputies, and which was a material cause in Deputy McAndrews' aggression toward Mr. McAfee.**

A content analysis of Deputy McAndrew's "Employee Evaluation" forms identify several deficiencies in the evaluation instrument's structure. The form uses a Likert-type scale rating of 1 through 5 to assess Deputy McAndrews in a variety of categories (Bates Stamp, DEF01201). The form does not identify what constitutes "acceptable productivity levels" for the nine performance evaluation categories: Quality of Work; Job Experience, Cooperation, Initiative, Responsibility, Appearance, Dependability, Human Relations, and Punctuality (DEF01201-01202). The form does not appear to mirror the job tasks of a peace officer, so the form on its face failed to include the core tasks of a deputy sheriff.

The scoring system used to evaluate employees has several disadvantages. "A disadvantage of the Likert-type summated rating method is that it is difficult to know what a single summated score means" (Zikmund, 2003, p. 314). Another disadvantage is that the "total score is computed by simply *assuming* that point values assigned to each possible response form

a numeric scale with the properties of order or with order and equal units" (Crocker & Algina, 1986, p. 50).

The performance assessment form also fails to include instruction for the evaluator regarding what criteria established for each numerical rating, and how the specific rating is to be applied to the employee. "The development of systematic rules and meaningful units of measurement for quantifying empirical observations is known as *scaling* (Crocker & Algina, 1986, p. 45). A review of the form's numerical scaling indicated its "elements in the data system can be ordered on the amount of property being measured, and the scaling rule requires that values form the real-number system must be assigned in this same order, an *ordinal scale*" (p. 47). In short, "ordinal values have the same property of order as values in the real-number system, but they lack the properties of equal distances between units and a fixed origin" (p. 47).

Rating instruments must have validity and reliability. *Validity* is "the ability of a scale or measuring instrument to measure what it is intended to measure" (Zikmund, 2003, p. 302). There are several types of validity: face (content) content validity; criterion validity; current validity; predictive validity; construct validity, and discriminant validity (pp. 302-304). *Reliability* "is the degree to which measures are free from error and therefore yield consistent results" p. 300).

There were no evidence-based documents showing the reliability coefficient of the "Employee Evaluation Form," nor were there any such documents showing how validity was established. Without validity and reliability, the performance and assessment instrument cannot be deemed statistically reliable, and therefore cannot be proven to be an accurate method to measure and assess employee performance. As a former professor of statistics and research methods, I am very familiar with this type of instrument construction and testing for reliability and validity. Based on my education, training, and experience, Harrison County, including its policymakers, failed to identify, adopt, and use a reliable and valid performance and assessment instrument for accurately measuring a deputy's and/or supervisor's performance.

A content assessment of the evaluation instrument for the evaluation period May 9, 2011 failed to use the evaluation instrument as a risk management tool. Lexipol (2018) co-founder, former peace officer, and attorney Gordon Graham noted "A properly prepared performance evaluation is an excellent risk-management tool. It is a regular opportunity to assess how a given employee is currently doing and what future risks they may face, and provide appropriate control measures to address those risks, with the ultimate goal of improving the employee's performance" (Lexipol, 2018, p. 2). Nothing was noted for the next period's goal setting, etc.

Based upon my education, training, and experience, the method of calculating Deputy McAndrews's overall performance score has no validity or reliability.

**11.     Harrison County and its policymakers have had a custom, practice, or policy of failing to objectively, quantitatively test their officers on ECW "Drive Stun" and other psychomotor domain skills during training programs to demonstrate their proper use of an ECW, which is outside the scope of career and educational testing standards for deputies who carry a TASER.**

Although the Harrison County Sheriff's Office TASER User-level lesson plan has not yet been produced, based upon my education, training, and experience, TASER lesson plans fail to quantitatively and/or competency-base test officers about ECW "Drive Stun" competency and related issues that falls below the standard of care regarding officer *essential skill* training and testing.

Based upon my education, experience, and training, quantitative performance objectives that are necessary to test officers regarding their psychomotor domain skill competencies are not included in Taser International, Inc. lesson plans. Unless officers were quantitatively assessed to *prove* they learned and understood the information and skills taught to them, given to them, trainers and/or the officer's employer cannot prove the employee's competency with the device, in this case an ECW.  The failure to quantitatively and objectively assess officer learning and understanding is outside the scope of required testing criteria for career and technical education programs such as use-of-force training.

Unless quantifiable instructional objectives are written into the specific unit of instruction and/or the course lesson plan, there is no way to know if the student passed the required performance objectives. "An objective is a description of a performance you want learners to be able to exhibit before you consider them competent" (Mager, 1975, p. 5). Measurement and evaluation are not the same. *Measurement* is a process of determining the extent of some characteristic associated with an object or person, which, for example, may be noting the length of a room, or the size of a classroom (Mager, 1973). Testing students is a form of measurement. "*Evaluation* is the act of comparing a measurement with a standard and passing judgment on the comparison" (Mager, 1973, p. 8).

Performance objectives contain 3 parts: conditions, performance, and standard, also known as a criterion (Mager, 1975; Orlich, Harder, Callahan, Trevisan, & Brown, 2004; Mager & Beach, 1967; Gronlund & Waugh, 2009).  *Conditions* are the circumstances under which the student will be required to perform the activity" (The Center for Vocational Education, 1977, p. 16).  *Performance* describes what the student is expected to do and must contain an *action verb*. *Standard or criterion* "describes the level of mastery or degree of proficiency that must be reached in carrying out the performance, in other words, how well the student must be able to do the job" (p. 17).

The Harrison County Sheriff's Office Training Academy reported its lesson plans must be reviewed by the Training Coordinator prior to being used (http://www.co.harrison.tx.us/Sheriffs%20Office/HCSO-TrainingAcademy-SOP.pdf . Exams are also used for cognitive and psychomotor skill assessment, but none has been produced regarding TASER training, policy and procedure training, ADA training, and mental illness training.

To properly determine a deputy's competency with equipment, it is imperative quantifiable assessments are used. The failure to use competency-based psychomotor skills

testing to ascertain the competency level of a deputy's skill in using a piece of required equipment falls below the standard of care for career and technical education requirements. Without such testing, the officer's employer, supervisor, and fellow officers cannot determine if the deputy is competent in the operation of the device. Also, the frequency of Deputy McAndrew's ECW training and re-training have not yet been produced for review.

**12.    Harrison County and its policymakers created a Sheriff's Office organizational atmosphere that condoned unconstitutional, reckless, and dangerous behavior by its deputies.**

Organizational culture is defined as "the collection of beliefs, expectations and values learned and shared by the [organization's] members and transmitted from one generation of employees to another . . . and generally reflects the [leaders] and the mission of the [organization]" (Wheelen & Hunger, 2006). Harrison County and its policymakers know that "not only does the organizational culture need to be reinforced, but also the *subculture* of the units where officers work every day. Police subculture is defined as the set attitudes and values that shape Peace Officer behavior. The police subculture commands our attention because it is generally seen as a major obstacle to reform and, thus, a powerful force working to erode any reforms which are in fact achieved (Peters, Wilhite, LaRochelle, 2015).

Unwritten Ground Rules (UGR), according to Dourado, often produce the "actual" culture of the organizational unit and/or the organization (Peters, Wilhite, LaRochelle, 2015). Lawrence Sherman (1974) was one of the first researchers in the criminal justice area to link organizational culture to deviant police behavior.  In his seminal text, **Police Corruption: A Sociological Perspective**, he introduced the terms *peer group secrecy* (where officers feel an intense sense of loyalty to one another, which fosters the Code of Silence), and *managerial secrecy* (police managers try to avoid hurting an officer, no matter how serious his or her offense).

Based upon my experience, education, and training, Harrison County and its policymakers failure to exercise their due diligence created an organizational atmosphere that protected deputies and ratified deputy misconduct, in part, because they deviated from the Sheriff's Office "Mission" and "Vision" statements (Bates Stamp, DEF01016).

**13.    Harrison County and its policymakers failed to conduct a timely and objective Internal Affairs investigation into the McAfee killing that appears will result in the ratification of Deputy McAndrew's outrageous conduct and which falls below internal investigative standards, recommendations, and guidelines.**

Nothing has been reviewed other than the Texas Department of Public Safety's investigation into the killing of Mr. McAfee by Deputy McAndrews. It is incomprehensible that if an internal investigation was conducted that Deputy McAndrews would not be disciplined for the fatal shooting of Mr. McAfee.

Regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency"

(CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity and discipline of each employee" (p. 52-1).

The International Association of Chiefs of Police (IACP) has issued guidelines for the investigation of employee misconduct and has also authored a model policy regarding such investigations (IACP, "Investigation of Employee Misconduct: Model Policy", July 2001). Regarding the disposition of a citizen complaint, the IACP recommends that: "The primary investigative authority for the investigation (i.e., subject employee's supervisor and commander or OPS) shall review the complaint report and investigate findings once deemed complete. This authority will compile a report of findings and provide a disposition recommendation for each charge as follows:

    a.    *Sustained*: Evidence sufficient to prove allegations.
    b.    *Not sustained*: Insufficient evidence to either prove or disprove allegations.
    c.    *Exonerated*: Incident occurred but was lawful.
    d.    *Unfounded*: Allegation is false or not factual or the employee was not involved (p. 3).

Based upon my education, training, and experience, if Harrison County and its policymakers decided not to take any significant corrective action in an attempt to alter Deputy McAndrew's outrageous behavior, such behavior would have been ratified by them thereby creating or reinforcing an organizational atmosphere that intentionally protected Harrison County law enforcement officers and/or ratified law enforcement officer misconduct. "Organizational culture refers to what makes an employee's experience of working at one law enforcement agency different than working for another similarly situated agency." Wheelen and Hunger (2006) defined organizational culture as 'the collection of beliefs, expectations and values learned and shared by the [organization's] members and transmitted from one generation of employees to another . . . and generally reflects the [leaders] and the mission of the [organization].' For many law enforcement agencies, the published official organizational culture in a policy manual or online only exists on paper or on the World Wide Web; the "real" organizational culture is far different.

"In his book, **The 60 Second Leader**, Dourado noted, 'The further away from the frontline and from actual worker and customer experience leaders are, the more likely the "official" culture is to depart from reality.' Similarly, Chief Bernard Parks (Ret.), Los Angeles Police Department (LAPD), explained how the highly publicized Rampart scandal developed, "Our failure to carefully review reports; our failure to examine events closely to identify patterns; our failure to provide effective oversight and auditing created the opportunity for this cancer to grow" (Peters, Wilhite, & LaRochelle, 2015).

Based upon my experience, education, and training, Harrison County and its policymakers have created an organizational atmosphere, if one does not already exist, that demonstrates bias toward protecting its officers, and bias against any potential claims that the citizens of Harrison County might justifiably have against their deputies.

## IX.    DEMONSTRATIVE EVIDENCE

I reserve the right to use demonstrative evidence at trial, including without limitation the video recordings, audio recordings, and any combination of them to illustrate the facts and my opinions expressed above.

## X.    COMPENSATION: See APPENDIX B.

# REFERENCES

*Bordanaro v. McLeod*, 871 F2d 1151, 1164 (1st Cir. 1989).

*City of Canton, Ohio v. Harris, et al*, 489 U.S. 378, 109. S.Ct. 1197 (1989).

Commission on Accreditation for Law Enforcement Agencies. (2001, November). *Standards for law enforcement agencies (4th ed.)*. Fairfax, VA: Author.

Graziano, A. M., & Raulin, M. L. (2000). *Research methods: A process of inquiry* (4th ed.). Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (1997). *Research methods: A process of inquiry* (3rd ed.). New York: Longman.

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

Gronlund, N. E., & Waugh, C. K. (2009). **Assessment of student achievement** (9th ed.). Upper Saddle River, NJ: Pearson.

Harrison County Sheriff's Office website. https://harrisoncountytexas.org/sheriffs-office/

International Association of Chiefs of Police. *IACP National Law Enforcement Policy Center: A Compilation of Model Policies, Volume I-V* (Version 4.0). Alexandria, VA: Author.

International Association of Chiefs of Police. (2002, July). *Investigation of Employee Misconduct: Model Policy*. Alexandria, VA: Author.

Lexipol, Inc. (2018). Performance Evaluations: Worth the Risk? CA: Author.

Mager, R. F. (1973). **Measuring instructional content or got a match?** Belmont, CA: Pitman Learning, Inc.

Mager, R. F., & Beach, Jr., K. M. (1967). **Developing vocational instruction**. Belmont, CA: Pitman Learning, Inc.

Orlich, D. C., Harder, R. J., Callahan, R. C., Trevisan, M.S., & Brown, A. H. (2004). **Teaching strategies: A guide to effective instruction** (7th ed.). Boston: Houghton Mifflin Company.

Orrick, W. D. (2004, November). Developing a Police Department Policy-Procedure Manual. In **Police chiefs desk reference: A guide for newly appointed police leaders** (pp. 138-155). Alexandria, VA: International Association of Chiefs of Police.

Peters, Jr., J. G., Wilhite, C., LaRochelle, J. (2015). Body-worn Cameras: Rebuilding public trust through organizational culture. *Police and Security News.*

Reiter, L. (2006). *Law enforcement administrative investigations: A manual guide* (3rd ed.). Indianapolis, IN: Public Agency Training Council.

Remsberg, C. (1986). **The tactical edge: Surviving high-risk patrol**. Northbrook, IL: Calibre Press, Inc.

Taser International, Inc. (2011, May 31). TASER® X2™, X3®, X26™, and M26™ Handheld ECD Warnings, Instructions, and Information: Law Enforcement. Scottsdale, AZ: Author.

Wheelen, T. L., & Hunger, J. D. (2006). **Strategic management and business policy** (10th ed.). Upper Saddle River, NJ: Pearson, Prentice Hall.

# APPENDIX A

## CASE DOCUMENTS REVIEWED and/or CONSIDERED

Harper, et al. v. McAndrews, et al.

1.     Plaintiff's Original, First, Second and Third Amended Complaints,

2.     9-1-1 Call (Bates No. DEF00014,

3.     Call 18-001570 (Bates No. DEF00017),

4.     Call 18-001585 (Bates No. DEF00018),

5.     CD: Interview with Family (Bates No. DEF00022),

6.     Defendant's Initial and Additional Disclosures (Disks 1, 2, & 3),

7.     Photos: McAndrew's at HCSO (Bates No. DEF00024),

8.     Ranger Mason Interview with Jeff McAndrews (Bates No. DEF00023),

9.     Defendant McAndrew's Responses to Plaintiffs' First Set of Interrogatories (9/22/2019),

10.    Plaintiff's Responses to Defendant McAndrews' First Set of Interrogatories (9/22/2019),

11.    Plaintiff's Responses to Defendant McAndrews' Requests for Admissions (9/22/2019),

12.    Digital video footage of McAndrews body-worn camera,

13.    Dashcam digital video footage from McAndrew's patrol car.

## APPENDIX  B

## COMPENSATION

Harper, et al. v. McAndrews, et al.


**Compensation**

I will invoice at my flat fee of $7500. Deposition testimony is invoiced at a flat daily rate of $2000.00 per day, if the deposition is taken at my location and pre-paid (otherwise it is $3000.00 per day), or $3000.00 if taken other than at my location, plus direct expenses. On-site visits are invoiced at $3000.00 per day, plus direct expenses. Time for trial testimony is invoiced at $2000.00 per day at my location and pre-paid (otherwise it is $3000.00 per day), or $3000.00 per day other than at my location, plus direct expenses.