# Pharr v. Wille

United States District Court for the Western District of Texas, Austin Division

July 29, 2016, Decided; July 29, 2016, Filed

No. 1:14-CV-762-DAE

**Reporter**
2016 U.S. Dist. LEXIS 99456 *; 2016 WL 4082740

JOHN PHARR, Plaintiff, vs. CHRISTOPHER WILLE, STEVEN McDANIEL, ART ACEVEDO in his official capacity as the Chief of Austin Police, and CITY OF AUSTIN, Defendants.

**Prior History:** Pharr v. Wille, 2016 U.S. Dist. LEXIS 48937 (W.D. Tex., Apr. 12, 2016)

**Counsel:** [*1] For John Pharr, Plaintiff: Paul Batrice, LEAD ATTORNEY, Batrice Law Firm, PLLC, Austin, TX; Randall Buck Wood, LEAD ATTORNEY, Doug W. Ray, Ray & Wood, Austin, TX.

For Christopher Willie, individually, Steven McDaniel, individually, Art Acevedo, in his official capacity as the Chief of Austin Police, City of Austin, Defendants: Lynn E. Carter, LEAD ATTORNEY, City of Austin - Law Department, Austin, TX.

**Judges:** DAVID ALAN EZRA, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DAVID ALAN EZRA

# Opinion

OMNIBUS ORDER: (1) GRANTING MOTION TO EXCLUDE EXPERT; (2) GRANTING POLICE OFFICERS' MOTION FOR SUMMARY JUDGMENT; (3) GRANTING CHIEF ACEVEDO'S AND THE CITY OF AUSTIN'S MOTION FOR SUMMARY JUDGMENT

Before the Court are three motions: (1) a Motion to Exclude the Expert Testimony of Dr. George Kirkham ("Dr. Kirkham") filed by Police Officer Christopher Wille, Police Officer Steven McDaniel, Chief Art Acevedo, in his official capacity as the Chief of Austin Police, and the City of Austin (collectively, "Defendants") (Dkt. # 29); (2) a Motion for Summary Judgment by Officers Wille and McDaniel (Dkt # 42); and (3) a Motion for Summary Judgment by Chief Acevedo and the City of Austin (Dkt. # 41). On July 28, 2016, the Court heard oral argument [*2] on all three motions: Randall Buck Wood, Esq., appeared on behalf of Plaintiff John Pharr, and Lynn E. Carter, Esq., appeared on behalf of Defendants. After careful consideration of the memoranda filed in support of and in opposition to the instant motions, as well as the arguments made at the hearing, the Court, for the reasons that follow, **GRANTS** Defendants' Motion to Exclude the Testimony of Dr. George Kirkham (Dkt. # 29), **GRANTS** Officers Wille's and McDaniel's Motion for Summary Judgment (Dkt. # 42), and **GRANTS** Chief Acevedo's and the City of Austin's Motion for Summary Judgment (Dkt. # 41).

BACKGROUND

At 3:22 a.m. on August 14, 2012, Police Officer Christopher Wille first noticed a vehicle driven by Pharr in the "Charlie" sector in Austin, Texas—a sector known for its high volume of criminal activity and where individuals often carry weapons. ("Wille Decl.," Dkt. # 41-6, Ex. BB ¶¶ 15, 17; "McDaniel Decl.," Dkt. # 41-18, Ex. CC ¶ 14.) Officer Wille observed Pharr's vehicle drift toward the right curb, then quickly swerve to the left to avoid striking the curb, and then drift again across the center line. (Wille Decl. ¶ 17.) Officer Wille decided to initiate a traffic stop by activating [*3] his overhead lights. (Id. ¶ 18.) Upon initiating his overhead lights, a video camera on the patrol car's dash board ("dash cam") automatically activated to record video and audio. (Id. ¶ 19.)

The Court's review of the dash cam video clearly shows Pharr use his right turn signal and turn right onto a side street upon

APPENDIX "D"

Case 2:18-cv-00520-RSP   Document 104-4   Filed 03/27/20   Page 2 of 14 PageID #: 1716

Page 2 of 14
2016 U.S. Dist. LEXIS 99456, *3

Officer Wille's initiation of the traffic stop. ("Wille Dash Cam," Dkt. # 41, Ex. BB, Attach. 2 at 3:24:32.) Pharr, however, made the right-hand turn too widely and crossed over a double yellow line and five lanes of traffic, coming to a stop on the wrong side of the street and facing on-coming traffic. (Id. at 3:24:32-3:24:42.) As soon as Officer Wille pulled his patrol car behind Pharr's stopped vehicle, Pharr immediately opened his driver-side door. (Id. at 3:25:00.) Officer Wille shouted "get in your car," "stay in your car," and "shut the door," in short sequence. (Id. at 3:25:01-3:25:07.) Pharr complied and closed his door.

Twelve seconds later, Officer Wille approached Pharr's vehicle, shined his flashlight into the vehicle, and asked "why did you pull over on the left hand side of the road?" (Id. at 3:25:19.) Pharr's answer is unintelligible from the dash cam audio. **[*4]** Officer Wille observed more occupants in the vehicle and Pharr told him that three people were inside. (Id. at 3:25:23-3:25:24.) The vehicle's windows were tinted, and Officer Wille and Pharr had the following exchange:

> Officer Wille: Roll down your back window.
> Pharr: Roll down my back window?
> Officer Wille: That's what I said. Roll down your back window.

(Wille Dash Cam at 3:25:25-3:25:31.) After a three second pause during which Pharr did not comply with the request, Officer Wille said "did I stutter?"[1] (Id. at 3:35:34.)

At this point, Defendant, Officer Steven McDaniel, arrived on the scene. Officer McDaniel parked his patrol car directly in front of Pharr's vehicle; a video camera on Officer McDaniel's dash board was actively capturing video and audio during the following events. (See "McDaniel Dash Cam," Dkt. # 41, Ex. CC, Attach. 2.) Both officers stood outside the drivers-side door while Officer Wille continued to question Pharr. Officer Wille asked Pharr for his "driver's license and insurance," **[*5]** (3:25:50) and asked Pharr to extinguish his cigarette (id. at 3:26:08). Pharr once again responded in the form of a question by saying "put my cigarette out?" (Id. at 3:26:10.) Officer Wille replied by saying "is this a game we're going to play all night long? When I tell you to do something, do it. Stop questioning what I'm telling you and do it. Put your cigarette out." (Id. at 3:26:10-3:25:19.) However, Pharr did not extinguish his cigarette and instead replied "sir, your name is Wille?" (Id. at 3:26:22.) Officer Wille answered "yes," and Pharr responded by asking a question, "yes?" (Wille Dash Cam at 3:26:22-3:26:24.)

---

[1] Subsequently, the Austin Police Department ("APD") counseled Officer Wille that his "interaction with [Pharr was] very confrontational and not professional." ("Sweeney Email," Dkt. # 41-21, Ex. 3.)

Up until this moment, the Court notes that Pharr's behavior during the traffic stop was largely non-compliant and he appeared agitated and increasingly aggressive. (Wille Decl. ¶ 26; McDaniel Decl. ¶¶ 13-14.) Indeed, Pharr's deposition testimony establishes that he was upset about being pulled over and he admits that he was not respectful to Officer Wille during the traffic stop. ("Pharr Dep. Tr.," Dkt. # 41-19 at 47:21-47:23, 48:12-48:23.) George Pitra, one of the passenger's in Pharr's vehicle, also gave explicit deposition testimony that Pharr was upset, angry, **[*6]** and "high-toned" upon getting pulled over by Officer Wille. ("Pitra Dep. Tr.," Dkt. # 41-20, Ex. E at 14:8-14:25.) Further, both officers gave sworn testimony that they smelled alcohol emanating from Pharr's breath and from the vehicular compartment. (Wille Dep. Tr. at 55:18-55:20; "McDaniel Dep. Tr.," Dkt. # 41-16, Ex. C at 47:14-47:20.) Pharr admitted that he consumed half a pitcher of beer and another one or two beers on the night of his arrest. (Pharr Dep. Tr. at 33:21-34:1, 35:12-35:14; 71:6-71:8.)

Officer Wille asked Pharr for his driver's license and insurance, but instead changed his command mid-sentence to "step out" and opened the drivers-side door. (Wille Dash Cam at 3:26:26.) Pharr replied by saying "okay, I'll step out, I'll step out." (Id. at 3:26:27-3:26:29.) Pharr was wearing sneakers, shorts, an un-tucked t-shirt and a baseball cap. Immediately upon Pharr stepping out of the vehicle, Officer Wille placed his left hand on Pharr's left wrist and his right hand on Pharr's upper left arm. (Id. at 3:26:29.) Officer Wille states that he took control of Pharr's left arm because he intended to frisk Pharr for weapons prior to conducting a field sobriety test. (Wille Decl ¶ **[*7]** 31.) When Pharr stepped out of the vehicle, he was holding a lit cigarette in his left hand and the dash cam audio clearly indicates that Officer Wille told Pharr to "put your cigarette down" and Officer McDaniel said "put your cigarette out." (Wille Dash Cam at 3:26:30.) Wille's dash cam video clearly shows that Pharr exited the vehicle, but instead of just standing still upon exiting, he took three steps past Officer Wille as the officer attempted to maintain control of his left arm. (Id. at 3:26:31-3:26:32.) Pharr admits that he took steps away from both Officer Wille and the vehicle upon exiting, even though Officer Wille had control of his left arm. (Pharr Dep. Tr. at 89:20-90:5.) Next, Officer Wille can be seen on the dash cam video losing his balance and dropping his flash light. Simultaneously, Officer Wille said "hey, hey stop." (Wille Dash Cam at 3:26:30; "Sweeny Dep. Tr.," Dkt. # 41-21 at 28:20-29:5.))

The following moment is disputed: Officer Wille contends that Pharr "tensed his arms, actively pulled his left arm away from [him]," and that is why he instructed Pharr to "stop." (Wille Decl. ¶ 31.) Pharr disagrees and disputes this fact. He states that he neither stiffened **[*8]** his left arm nor pulled his

left arm away from Officer Wille. (Pharr Dep. Tr. at 90:6-90:12.) However, as mentioned above, Pharr admits to taking steps past Officer Wille.

Nevertheless, Officer Wille conducted a take-down maneuver on Pharr; he took Pharr down onto a residential lawn supported by a knee-high retaining wall. (Wille Decl. ¶ 31; Wille Dash Cam at 3:26:33.) Pharr landed face-down and Officer Wille assumed a position on Pharr's back while Officer McDaniel took control of Pharr's legs. While Pharr was on the ground, Officer Wille took control of Pharr's right arm and held it in a wrist lock. (Wille Decl. ¶ 31.) Pharr admits that his left arm was underneath his stomach. (Pharr Dep. Tr. 90:15-91:2.) While on Pharr's back and attempting to take control of his left arm, Officer Wille can be heard saying "when I fucking tell you do something, give me your hand." (Wille Decl. ¶ 33.)

Next, the dash cam audio establishes that Officer Wille yelled at Pharr three separate times to give up his left hand while on Pharr's back. (Wille Dash Cam at 3:26:40, 3:26:42, 3:26:44.) Officer Wille admits that he delivered one empty-handed, closed-fist strike to Pharr's rib cage in an effort to cause [*9] Pharr to roll over and release his left arm. (Wille Decl. ¶ 34.) Pharr did not release his left arm and Officer McDaniel administered five closed-fist punches to Pharr's left thigh. (Wille Dash Cam at 3:26:49-3:26:51; McDaniel Decl. ¶ 17; McDaniel Dash Cam at 3:27:03-3:27:07.) Accordingly to Lieutenant Sweeney, the officers' supervisor, it was common practice for police officers to target the peroneal nerve in the thigh to gain compliance from a non-compliant person during an arrest. (Sweeney Dep. Tr. at 42:17-42:25.) During the struggle, both officers yelled at Pharr to stop resisting. (Wille Dash Cam at 3:26:50-3:26:51; McDaniel Dash Cam at 3:27:05.) Pharr's deposition testimony, however, states that he was not resisting, he never tried to hold his arm underneath his body, and that he could not release his arm because it was underneath him. (Pharr Dep Tr. at 98:13-98:19.) After Officer McDaniel's final strike to Pharr's leg, Officer Wille announced that he had control of Pharr's other hand. (Wille Dash Cam at 3:26:52.) Neither officer struck Pharr again. The entire episode, from the moment Pharr stepped out of the vehicle to Officer McDaniel's fifth and final strike, lasted 22 seconds. [*10]

On August 13, 2014, Plaintiff Pharr filed the instant lawsuit. (Dkt. # 1.) Pharr alleges the following causes of actions: (1) violation of his Fourth and Fourteenth Amendment rights to be free from excessive force brought pursuant to 42 U.S.C. § 1983; (2) assault and battery against Officer Wille; (3) assault and battery against Officer McDaniel; (4) false imprisonment by Officer Wille; (5) false imprisonment by Officer McDaniel; (6) malicious criminal prosecution by Officer Wille; (7) malicious prosecution by Officer McDaniel; and (8) negligent hiring, supervision, training, and retention by the Chief of Police and the City of Austin. (Id.). On April 12, 2016, the Court issued an order dismissing the false imprisonment claims, malicious prosecution claims, and the negligent hiring claims based on Pharr's voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2). (Dkt. # 68.)

On September 14, 2015, Pharr filed a Supplemental Expert Witness Disclosure notice. (Dkt. # 24.) In that notice, Pharr filed Dr. Kirkham's expert report. The opinions rendered in Dr. Kirkham's expert report can generally be summarized as follows:

> 1. Officer Wille and the Austin Police Department ("APD") "committed extremely serious violations of well established standards and procedures [*11] of the law enforcement profession;"
> 2. Officer Wille exhibited the psychological condition of "badge heaviness" and "John Wayne Syndrome" as evidenced by his statements and body posture prior to asking Pharr to step out of the vehicle;
> 3. That APD has "clearly adopted a de facto custom and practice of allowing and justifying the use of [sic] excessive force by its officers;" and
>
> 4. Officer Wille's and Officer McDaniel's take-down and strikes to Pharr's body was objectively unreasonable based on the standard announced in Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

("Kirkham Report," Dkt. # 24 at 4-8.) On January 7, 2016, Defendants filed an Amended Motion to Exclude Plaintiff's Expert Dr. George Kirkham. (Dkt. # 29.) On January 21, 2016, Pharr filed his response. (Dkt. # 32.) On February 1, 2016, Defendants filed their reply. (Dkt. # 43.)

On January 7, 2016, Defendants filed an Amended Motion to Exclude Plaintiff's Expert Dr. George Kirkham. (Dkt. # 29.) On January 21, 2016, Pharr filed his response. (Dkt. # 32.) On February 1, 2016, Defendants filed their reply. (Dkt. # 43.)

On January 29, 2016, Art Acevedo, in his official capacity as the Chief of Police, and the City of Austin filed a Motion for Summary Judgment seeking relief [*12] on the ground of qualified immunity. (Dkt. # 41.) On February 1, 2016, Officer Wille and Officer McDaniel filed a Motion for Summary Judgment seeking relief on the basis of qualified immunity. (Dkt. # 42.) On February 26, 2016, Plaintiff filed his responses to both motions. (Dkt. ## 45, 46.) Acevedo and the City and Officer Wille and Officer McDaniel filed a replies (Dkt. ## 49, 50).

LEGAL STANDARD

I. Expert Witness Standard

Federal Rule of Evidence 702 provides:
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> b. the testimony is based on sufficient facts or data;
>> c. the testimony is the product of reliable principles and methods;
>> d. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule lays responsibility on the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

"Before a district court may allow a witness to testify as an expert, it must be assured that the [*13] proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Id.

To determine whether testimony is reliable, the court must assess whether the reasoning or methodology underlying the testimony is scientifically valid. Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The party seeking admission of expert testimony must show the testimony is reliable by a preponderance of the evidence. Id. "This requires some objective, independent validation of the expert's methodology." Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002) (quoting Daubert, 509 U.S. at 596). Courts consider five non-exclusive factors in making this determination: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; (4) the [*14] existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94. In evaluating these factors, the court must focus on the expert's "principles and methodology, not on the conclusions" generated. Id. at 594.

"In addition to being reliable, expert testimony must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" Roman v. Western Mfg., Inc., 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid. 702(a)). Under Rule 702, this means that the proffered expert testimony must be relevant. Id. "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." Id. (quoting Daubert, 509 U.S. at 591 (internal quotation marks and citations omitted)).

II. Summary Judgment Standard

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014). "Substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In seeking summary judgment, the moving party bears the initial burden of demonstrating [*15] the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012)

(quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

"Although we review evidence in the light most favorable to the non-moving party, [the Fifth Circuit] assign[s] greater weight, even at the summary judgment stage, to the facts evident from the video recordings taken at the scene." Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011). "A [court] need not rely on plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the video.'" Id. (quoting Scott v. Harris, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)).

III. Qualified Immunity

"The doctrine of qualified [*16] immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Thompson v. Mercer, 762 F.3d 433, 436-37 (5th Cir. 2014).

Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to show a violation of a clearly established constitutional right. Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014). Accordingly, when a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment, a court must decide: "(1) whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right; and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law." Carroll v. Ellington, 800 F.3d 154, 169 (5th Cir. 2015). A court may determine these questions in any order. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). As to the second prong, a government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have [*17] then known that the defendant's conduct violated the plaintiff's rights. Carroll, 800 F. 3d at 169.

DISCUSSION

I. Dr. Kirkham as an Expert Witness

Plaintiff states that Dr. Kirkham is his "police policies and procedures expert." (Dkt. # 32 at 2.) However, Dr. Kirkham describes his "area of expertise [is] in body language and [in] verbal judo." ("Kirkham Dep. Tr.," Dkt. 28-2, Ex. A at 44:8-44:10.)

A. Expert Qualifications as Professor and Doctorate in Criminology

Dr. Kirkham is presently a Professor Emeritus in the College of Criminology and Criminal Justice at Florida State University. ("Kirkham C.V.," Dkt. # 32, Ex. A-1.) He attained emeritus status in 1991 and admits he has not taught any courses since then. (Kirkham Dep. Tr. at 17:2-17:9.) Dr. Kirkham has not specified his exact area of expertise based on his doctorate in criminology. Further, Dr. Kirkham has testified that he has not lectured in any capacity as a professor since 1991. Dr. Kirkham admits that since his retirement from full-time teaching 25 years ago, he has not participated in any training on how to handle a driving while intoxicated ("DWI") suspect, and only stays abreast of developments in policing by having "sit-down discussion[s]" with police officers [*18] who work for him while off-duty. (Kirkham Dep. Tr. at 53:21-54:11.) Such "sit-down discussions" are not sufficient to convince this Court that Dr. Kirkham has an expertise in relevant police training and developments in the use of force over the past 25 years.

Additionally, the Court's review of his publication list does not support his expert witness qualifications. Dr. Kirkham's most recent publication is a 2010 book on "International Sex Trafficking of Women and Children," a topic wholly irrelevant to his qualifications on the subject-matter of this case. The majority of his books are about his experience as a "professor who became a cop" and the majority of his professional papers are on issues not connected to the use of force or traffic stops. (Kirkham C.V.) The only potentially relevant publications that might support Dr. Kirkham's expertise are an educational film produced in 1979 titled "Excessive Force and the Police," a training video he produced in 1989 on "Police Human Relations: Non-Verbal Communication," and a professional paper titled "Body Language and Policing," published in 1990. (Kirkham C. V.) Only a small fraction of Dr. Kirkham's academic publications demonstrates [*19] any potential expert knowledge and education about the subject matter at the heart of this case. Due to the absence of substantial publications and research on relevant policing issues germane to the instant litigation, the Court cannot find Dr. Kirkham is qualified to be an expert in this case. Accordingly, the Court finds that Dr. Kirkham's academic achievements do not warrant certification as an expert witness because he is not qualified to testify on the use of force during a traffic stop. Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.")

B. Expert Qualifications as a Police Officer

In addition to being a professor, Dr. Kirkham also served as a police officer in a part-time capacity from 1973 to 1992. (Kirkham C. V.) However, over that 18-year period Dr. Kirkham only worked as a full-time police officer for six months. (Kirkham Dep. Tr. at 29:19-30:3.) Dr. Kirkham admits that he was a police officer "for [the] specific purpose as a scientist functioning as a police officer," (id. at 34:13-34:14) and that his 18 years of part-time policing actually equates [*20] to a total of one-and-a-half years of actual police work (id. 34:16-34:18). Dr. Kirkham explains that in his 18-year tenure as a police officer, he worked as "a university professor all week" and was only on the beat for "one day or one night." (Id. at 33:25-34:2.) Dr. Kirkham was never a certified law enforcement instructor and has never instructed law enforcement officers on how to deal with individuals suspected of DUI.

The Court finds that Dr. Kirkham is also not qualified to testify as an expert in this case because his actual police experience amounts to no more than one-and-a-half years, and part of his time as a police officer involved experiences wholly irrelevant to the instant issues. Dr. Kirkham spent three months of his total year-and-a-half of full time policing with a Department of Justice organized crime unit where he did not handle any traffic stops, and he spent his final five years of part-time policing in an experimental crisis intervention unit that focused solely on body language and non-verbal communications during police intervention in domestic violence and mental health situations. (Kirkham Dep. Tr. at 26:1-26:8.) Such experiences are irrelevant to the issue [*21] of excessive force and police conduct during a DUI traffic stop and do not serve as a basis to qualify Dr. Kirkham as an expert in the instant case. Absent those experiences, Dr. Kirkham has spent approximately twelve months as a full-time patrol officer, a period of time commensurate with the experience level of a new police officer directly out of a training academy. While Dr. Kirkham has conducted DUI stops in the past, he could not quantify the amount, he could not recall when he last conducted such a stop, and he has never been a law enforcement instructor on DUI stops, excessive force, or any other policing activity.

To certify Dr. Kirkham's expertise on the issue of excessive force during a DUI traffic stop on the basis of this limited experience would abdicate this Court's gatekeeping function. Dr. Kirkham's testimony indicates that his actual police work was limited in time and scope to such an extent that his knowledge, skill, and experience does not qualify him as an expert to testify about police practices during a DUI stop, nor does it qualify him as an expert on use of force methods in the 21st century. His relevant knowledge, skill, and experience would not aid the fact-finder [*22] in determining reasonable police conduct in the situation at issue. Indeed, this Court's review of cases where federal district courts certify police officers as an expert witness demonstrates a high bar that Dr. Kirkham fails to meet. Perez v. City of Austin, No. A-07-CA-044 AWA, 2008 U.S. Dist. LEXIS 36776, 2008 WL 1990670, at *3 (W.D. Tex. May 5, 2008) (police officer qualified as an expert because he had 25 years full-time experience, certified as a Taser instructor, had more than 3,000 hours of training, and the legal issue pertained to an officer's use of a taser); Houston-Hines v. Hous. Indep. Sch. Dist., No. Civ.A. H-04-3539, 2006 U.S. Dist. LEXIS 29728, 2006 WL 897209, at *3 (S.D. Tex. Apr. 4, 2006) (finding a 29-year veteran police officer unqualified as an expert witness due to his lack of experience in the type of policing relevant to the issue at trial). Accordingly, Dr. Kirkham lacks sufficient training and relevant experience to testify as an expert on the subject matter germane to this case.

C. Reliability of Dr. Kirkham's Opinion

Even if the Court were to qualify Dr. Kirkham as an expert witness for policing techniques based on his academic background, his testimony would fail the reliability prong of the Daubert analysis. Reliability means that the expert's testimony must be based on the "methods and procedures of science" rather than on [*23] "subjective belief or unsupported speculation," and "[p]roposed testimony must be supported by appropriate validation . . . ." Daubert, 509 U.S. at 590. Here, there is no evidence in the record that Dr. Kirkham's training video, various professional papers, or any other publications are based on "methods and procedures of science." Further, nowhere in his expert report does Dr. Kirkham cite or describe the methodology behind his opinions about Officer Wille's interaction with Pharr. Instead, his report merely cites other authors' books and articles as the basis for his opinions.

To the extent that Dr. Kirkham relies on his cumulative research from 18-years as a part-time police officer, he described that research methodology as "watching my own behavior [while on patrol], making notes on it at the end of my shift, observing the officers that I backed up or backed [me up] on a call. I'm observing the body language." (Kirkham Dep. Tr. at 59:3-59:14.) The Court finds that a methodology based on observing yourself is subject to tremendous biases, lacks indicia of scientific precision and accuracy, and thus results in opinions that fail to meet the reliability prong of the Federal Rules of Evidence. Further, Dr. Kirkham has [*24] not provided independent validation of his research methodology and there is no indication that his publications have been peer reviewed. Accordingly, even if the Court were to qualify Dr. Kirkham as an expert, his opinions clearly fail the reliability prong of Daubert.

This Court's determination that Dr. Kirkham is an unqualified

expert witness whose conclusions are unreliable is not an unchartered conclusion. It is true that Dr. Kirkham's expert reports and affidavits have been cited for purposes of summary judgment. However, in cases where Dr. Kirkham's expert testimony faced a direct Daubert challenge, this Court's review of case law reveals that federal district courts have summarily rejected his qualifications and opinions. See Gandy v. Robey, No. 1:10CV65, 2011 U.S. Dist. LEXIS 157964, 2011 WL 11550067, at *1 (E.D. Va. May 16, 2011) (striking Dr. Kirkham's expert testimony from trial); Berdardi v. Village of Sauget, Ill., Civil No. 05-898-CJP, 2008 U.S. Dist. LEXIS 125480, 2008 WL 5134185, at *4 (S.D. Ill. July 21, 2008) ("Dr. Kirkham's opinions regarding the alleged incident, [the officer's] use of force, and the causal connection between the Village and the alleged incident all clearly fail to satisfy Rule 702 or Daubert and must be barred." (emphasis in original)); Estate of Morales, Jr. v. City of Jersey City, Civil Action No. 05-5423, 2010 U.S. Dist. LEXIS 86882, 2010 WL 3326805, at *2-3 (D.N.J. Aug. 24, 2010) (excluding Dr. Kirkham's opinion because it is not based on reliable methods, [*25] his reports provide no methodology, and his statements are conclusory at best); Giraldo v. City of Hollywood, Florida, 142 F. Supp. 3d 1292, 2015 WL 6735225, at *6-7 (S.D. Fla. 2015) (excluding Dr. Kirkham's expert opinion because it was conclusory and not supported by any reliable, articulable methodology).

Accordingly, the Court finds that Dr. Kirkham is not qualified to testify as an expert witness in this case.

II. Qualified Immunity for Fourth Amendment Excessive Force Claims

Plaintiff asserts that Officer Wille and Officer McDaniel each used excessive force in effecting his arrest by: (1) tackling him onto the ground; and (2) striking him with empty handed closed fisted punches into the chest and thigh. Officer Wille and Officer McDaniel assert qualified immunity as a defense to these claims.

As an initial matter, at oral argument Plaintiffs counsel focused a significant portion of his time arguing that the video failed to show Pharr was driving erratically. It seems that counsel contends Officer Wille lacked probable cause to seize Pharr in the first instance. Whether or not the video supports probable cause is irrelevant; Pharr does not challenge his initial seizure under the Fourth Amendment to the U.S. Constitution or any state law. Indeed, Pharr initially brought claims for [*26] false imprisonment and malicious prosecution against the officers alleging lack of probable cause. (Dkt. # 64.) However, on April 12, 2016, the Court issued an order granting Plaintiff's motion to dismiss his false imprisonment and malicious prosecution with prejudice. (Dkt. # 68.) Accordingly, there is no challenge to Pharr's initial seizure before the Court and counsel's focus on the issue is irrelevant.

To the extent Plaintiff's counsel focused on the quality of Pharr's driving in the video to call into question Officer Wille's credibility that he observed Pharr drive erratically, the court notes the following. First, the Court generally "may not make credibility determinations or weigh the evidence." McData Servs. Corp., 646 F.3d at 326. Second, the Court finds that a large measure of Officer Wille's testimony about Pharr's erratic driving occurred before the video started to capture the subsequent events.[2] Further, the Court notes that the video shows Pharr's vehicle, although not crossing traffic lines, sway and veer within those lines. Finally, the Court notes that the video indisputably establishes that Pharr crossed over five lanes of traffic and came to a complete stop on the wrong side of the road, facing any [*27] eventual incoming traffic.

A. Whether a Constitutional Right was Violated

The first prong of qualified immunity is whether a defendant's conduct violated a constitutional right. Hogan v. Cunningham, 722 F.3d 725, 734 (5th Cir. 2013). To state a violation of the Fourth Amendment's prohibition on excessive force, a plaintiff must allege: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and that (3) the force used was objectively unreasonable." Id. (quoting Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004)).

1. The Injury that Directly Resulted from the Excessive Force

"A plaintiff alleging an excessive force violation must show that she has suffered 'at least some injury.'" City of Palacios, 381 F.3d at 397 (quoting Jackson v. R.E. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993)).

Pharr attests that he suffered two injuries as a direct result of the use of force applied by Officers Wille and McDaniel: a bloody, scraped knee, and a broken wrist. ("Pharr Aff," Dkt. # 45-1.) Defendants object on various grounds as to whether Pharr has proffered sufficient evidence to prove this element: (1) Pharr's affidavit contradicts his sworn deposition testimony; [*28] [3] (2) Pharr has failed to prove injury and

---

[2] The record reflects that the Dash Cam's installed in Austin police car's only record the previous thirty seconds before an officer engages his or her overhead lights and all subsequent conduct thereafter.

[3] Pharr gave deposition testimony that he told his medical physician that he broke his wrist while skateboarding because he was embarrassed to tell a doctor he broke his wrist during an arrest. (Pharr Dep. Tr. at 80:4-80:12.)

causation because he has not produced an expert medical opinion;[4] and (3) Pharr failed to complain about his broken wrist at the moment of arrest and during his jail intake. (Dkt. # 50 at 7-8.) To the extent Defendants object to Pharr's credibility and any contradictions contained within his affidavit, sworn testimony, and jail intake form, the Court overrules them. At summary judgment, the Court "may not make credibility determinations or weigh the evidence." McData Servs. Corp., 646 F.3d at 326. Further, Defendants' alleged assertion that proof of injury requires expert medical opinions is not supported by case law. See Brown, 2005 U.S. Dist. LEXIS 50002, 2005 WL 473681, at *4 (finding plaintiffs affidavit sufficient to show injury and causation). Finally, Defendants themselves have submitted photographic proof that Pharr suffered a bloody abrasion as a result of the take-down. (Dkt. # 41-4.)

The Court notes that a photograph of Pharr in the backseat of Officer Wille's patrol car on the night of the incident clearly depicts blood and abrasions on Pharr's right knee. (Dkt. #41-14.) The Court finds that Plaintiff has sufficiently come forward with evidence that he suffered "at least some injury" as a result of the use of force by Officers Wille and McDaniel. See Brown v. Faison, No. Civ.A. 6:04-CV-016-C, 2005 U.S. Dist. LEXIS 50002, 2005 WL 473681, at *4 (N.D. Tex. Mar. 1, 2005) (finding that a plaintiffs affidavit stating she suffered bruising to her body as a result of the arrest was sufficient to show some injury).

2. Whether the Use of Force was Objectively Unreasonably

Whether the use of force was objectively unreasonable depends on the "totality of the circumstances." Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985); Schaefer v. Whitted, 121 F. Supp. 3d 701, 711-12 (W.D. Tex. 2015). Courts "give careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

The "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than on the 20/20 vision of [*30] hindsight." Id.; Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2011). Indeed, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" constitutes a Fourth Amendment violation. Graham, 490 U.S. at 396 (citation omitted). The determination of reasonableness must take into account the fact that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Id. at 397.

The "reasonableness" inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (citing Scott, 436 U.S. at 137-39). Accordingly, "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." Id.

Most recently, the Supreme Court has articulated a series of nonexclusive factors that bear on the reasonableness of the force used: (1) "the relationship between the need for the use of force and the amount of force used;" (2) "the extent of the plaintiffs injury"; (3) "any effort made by the officer to temper or limit the amount of force"; (4) "the severity of the security [*31] problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015) (citing Graham, 490 U.S. at 396).

(i) The First Use of Force: The Take-Down

Viewing the undisputed facts and the disputed facts in the light most favorable to Pharr, the Court finds these facts material and relevant to its analysis: (1) while acting in compliance with Officer Wille's command, Pharr voluntarily exited his vehicle, but after admittedly being non-compliant with Officer Wille's previous verbal requests; (2) Pharr held a lit cigarette in his left hand upon stepping out of his vehicle; (3) Pharr took steps away from both Officer Wille and the vehicle even though Officer Wille had taken control of his left arm; (4) Pharr did not tense up his arm or pull it away from Officer Wille; and (5) he was immediately tackled by Officers Wille and McDaniel.

The police officers' conduct in taking Pharr to the ground was objectively reasonable under the totality of the circumstances and upon consideration of the Graham and Kingsley factors. The crime of driving while intoxicated is a serious crime and intoxicated individuals are known to act irrationally and without warning. See Birchfield v. North Dakota, __ U.S. __, 136 S.Ct. 2160, 2178, 195 L. Ed. 2d 560 (2016). Here, [*32] Pharr admits to having consumed half of a pitcher of beer and two other beers (Pharr Dep. Tr. at 33:21-34:1, 35:12-35:14; 71:6-71:8.), and Officer Wille smelled alcohol on Pharr (Wille Decl. ¶[24). Indeed, the Fifth Circuit has granted police officers qualified immunity where they physically

---

[4] Pharr gave deposition testimony that his medical doctors expressed no opinion about how the break occurred. (Pharr Dep. Tr. [*29] at 82:12-82:14.)

manipulated a suspected drunk driver and used a taser on him. See Poole, 691 F.3d at 625-26.

Second, it was objectively reasonable for the officers to believe that Pharr posed an immediate threat to their safety. The sector of Austin where the traffic stop occurred was known for high-crime and violence; individuals were known to carry weapons as well. (Wille Decl. ¶15; McDaniel Decl. ¶ 9.) The officers had no way of knowing whether or not Pharr was armed, and assuming that he was armed would have been objectively reasonable given the neighborhood and time of night. Further, Pharr's previous non-compliance with Officer Wille's instructions during the traffic stop makes it objectively reasonable for the officers to have believed that some physical force may have been necessary to effectuate compliance. Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical [*33] force is needed to effectuate the suspect's compliance.") (citing Mecham v. Frazier, 500 F.3d 1200, 1205 (10th Cir. 2007)). Pharr also held a lit cigarette in his hand when he exited the vehicle, which both he and the officers admit could have been used as a weapon to either burn the officers or flick ashes into an officer's face. (Sweeney Dep. Tr. at 23:4-24:9) ("[A] cigarette presents an officer-safety hazard . . . he could easily be burned with it . . . the cigarette can be thrown in their face.") Additionally, Pharr's stepping away from the vehicle and slightly past the two officers, despite Officer Wille having placed his hands on Pharr's left arm, caused Officer Wille to lose his balance and turn his back on the vehicle where other passengers remained. Pharr's creation of the condition where the officers' backs were turned to unknown persons further increased the risk of the situation and threat to the officers. See Hogan v. Cunningham, 722 F.3d 725, 736 (5th Cir. 2013) (granting qualified immunity because officers were justified in conducting a "take-down" of plaintiff because another unknown male was in the room who could have posed a threat).

The third Graham factor-whether Pharr was actively resisting arrest or attempting to evade arrest by flight-also indicates that the officer's [*34] take-down of Pharr was reasonable under the circumstances. As soon as Officer Wille pulled his patrol car behind Pharr's vehicle, Pharr opened his door; only upon Officer Wille commanding him to close the door did Pharr comply. (Wille Dash Cam at 3:25:00-3:25:07.) The Court finds that such conduct makes it objectively reasonable for an officer to believe that a suspect might have the propensity to flee, escape, or evade arrest. Next, construing the evidence in the light most favorable to Pharr that he did not pull his arm away from Officer Wille, the take-down was objectively reasonable. The video dash cam unmistakably shows that upon exiting his vehicle and having Officer Wille take control of his left arm, Pharr continued to take two to three steps away from both the vehicle and Officer Wille. (Id. at 3:26:31-3:26:32.) The video also unambiguously shows Officer Wille reaching with his right arm to re-gain control of Pharr because he stepped away from the officers. (Id) While in some circumstances such conduct by a citizen during an interaction with police may not justify a seizure by take-down, such benign and neutral circumstances are not present here. Instead, this case demonstrates [*35] a classic example of a circumstance where an officer—operating in the dark at 3:30am in a high-crime neighborhood where people were known to carry weapons, after a suspect had demonstrated a pattern of verbal non-compliance, reasonable suspicion existed that the suspect was intoxicated, where unknown individuals remained in a vehicle with darkly tinted windows, and the suspect held a lit cigarette in his hand—had to make a split-second police judgment. Graham, 490 U.S. at 397 (holding that the determination of reasonableness must take into account the fact that "police officers are often forced to make split-second judgments"). Given the totality of these circumstances, it was objectively reasonable for the officers to conduct a take-down on Pharr after he stepped past Officer Wille as the officer attempted to control Pharr's left arm to initiate a frisk. Indeed, the dash cam video demonstrates how the instant situation was "tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 397, demonstrating the objective reasonableness of the officers decision to take Pharr down.

At oral argument and in his briefing, Pharr alludes to an argument that his take-down was retribution for his non-compliance and rudeness during the traffic [*36] stop. Pharr characterizes Officer Wille as being "angry, anxious, aggressive, and . . . verbally abusive." (Dkt. # 45 ¶ 6.) Any argument of the sort is irrelevant as a matter of law. The Supreme Court held that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." Graham, 490 U.S. at 397. Nevertheless, the video evidence and the evidence in the record fail to establish that the use of force in this case was wanton or gratuitous. To the contrary, the video evidence shows that Officer Wille's use of force was measured; he initiated force by placing his hands on Pharr's left arm to initiate a frisk prior to a field sobriety test, and only escalated force upon the circumstances described above. During the escalation of force the officers never pulled their guns nor hit the Plaintiff in the face or the head.

Further, to the extent that Pharr argues that Officer Wille created the situation that precipitated the use of force, that contention is irrelevant. Even if a police officer creates a dangerous situation that ultimately led to the use of force, it is

irrelevant to the reasonableness inquiry. Cass v. City of Abilene, 814 F.3d 721, 731 (5th Cir. 2016). As the Fifth Circuit has explained:

> The excessive force inquiry is **[*37]** confined to whether the officer was in danger at the moment of the threat that resulted in the officer's [use of force]. Therefore, any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit.

Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014) (internal citation omitted), cert. denied, _ U.S. _, 135 S. Ct. 137, 190 L. Ed. 2d 45 (2014).

Accordingly, the Court finds that Officers Wille's and McDaniel's take-down of Pharr was objectively reasonable under the totality of the circumstances.

(ii) The Second Use of Force: The Strikes

The second use of force occurred where the officers issued six closed fisted strikes to Pharr's body, immediately after they took him to the ground to gain control of his left arm.

Viewing the evidence in the light most favorable to Pharr— evidence which includes the dash cam video that captures much of the dispute underlying Pharr's claims—the Court finds that the six strikes used to arrest him were not objectively excessive or unreasonable. This Court's conclusion is guided by Poole, where the Fifth Circuit granted police officers qualified immunity under the following scenario:

> It is undisputed that [the officer] repeatedly commanded Poole to turn around and give up his right arm. It is **[*38]** undisputed that Poole did not do so. Poole's resistance was immediate and persistent. [The officer] responded with verbal commands and attempted to grab Poole's arm, before resorting to a taser, which, the video reveals, he applied and withdrew very quickly.

691 F.3d at 629. Here, the facts are aligned symmetrically, except the officers used closed-fist strikes instead of a taser. It is undisputed that the officers repeatedly commanded Pharr to give up his left arm. It is also undisputed that Pharr did not do so. Indeed, Pharr admits in his deposition testimony that the officers had to pull his left arm out from underneath him. (Pharr Dep. Tr. at 91:6-91:8.) Pharr's resistance was immediate and persistent. Officer Wille responded with verbal commands and attempted to grab Pharr's arm before the officers resorted to closed-fist strikes, which, the video reveals, they applied and ceased immediately upon securing Pharr's left arm.

While on the ground, Pharr lay on his stomach with his left arm underneath his body while Officer Wille straddled his back and Officer McDaniel controlled his legs. (Id. at 90:13-91:8.) The video evidence indisputably shows the officers issuing multiple commands to Pharr to **[*39]** give up his left arm, and it is undisputed that Pharr did not release his arm because, according to him, he was unable to release it because it was stuck underneath his body. However, instead of tasing the suspect like in Poole, Wille issued one closed-fist strike to Pharr's ribcage and McDaniel issued five closed-fist strikes to his left thigh in an attempt to make him roll over and give up his left arm. The strikes were successful and Officer Wille was able to take control of Pharr's left arm to effectuate the arrest. Indeed, Pharr admits that Officer Wille had to pull his left arm out from underneath him. (Pharr. Dep. Tr. at 91:6-91:8.) No more strikes occurred after Pharr was taken into custody.

The officers first issued multiple verbal commands and only used physical force upon perceived non-compliance. Viewed objectively, Wille and McDaniel responded with "measured and ascending" responses that corresponded to Pharr's perceived resistance. See Poole, 691 F.3d at 629 (holding that "measured and ascending" responses demonstrates reasonable use of force) (quoting Galvan v. City of San Antonio, 435 F. App'x 309, 311 (5th Cir. 2010)). Indeed, the Fifth Circuit has found it objectively reasonable for a police officer to apply a taser "to an unarmed, seated suspect who fails **[*40]** to comply with an order to get on the ground." Carroll, 800 F.3d at 174. Here, the police officers verbally commanded Pharr to give up his left hand four separate times, and Pharr failed to do so. Under Carroll, it would have been objectively reasonable for the police officers to apply a taser to Pharr, but instead, they used a reduced level of force by applying closed fisted strikes. Such conduct is objectively reasonable.

It is of no legal consequence that in Pharr's version of events he did not affirmatively hold his arm underneath his body in an attempt to resist arrest, but that instead it was simply stuck underneath the weight of his body and Officer Wille's. (Pharr Dep. Tr. at 98:13-98:19.) This Court may not look back with 20/20 hindsight, but must approach the moment from the perspective of a reasonable officer on the scene. In such case, there is no reason for the Court to believe that a reasonable police officer in the heat of the moment would know the relevant difference between a suspect resisting arrest by holding his arm underneath his body versus a suspect's body weight keeping his arm pinned beneath his body. Such resistance caused by the latter circumstance could be objectively viewed as **[*41]** affirmative resistance in the circumstances of this case. Further, it was objectively reasonable for the officers to believe that Pharr could have been using his left hand to reach for a weapon in his waistband. (Sweeney Dep Tr. at 37:22-37:25.) As noted

above, the traffic stop occurred in the middle of the night in a high-crime neighborhood where individuals were known to carry weapons. (Wille Decl. ¶ 15; McDaniel Decl. ¶ 14.) Such circumstances demonstrate that it was reasonable for the officers to believe that Pharr posed an immediate threat to their safety by having his left arm underneath his body. This situation was "tense, uncertain, and rapidly evolving," Graham, 490 U.S. at 396, and the officers' decision to strike Pharr to take control of his left arm was objectively reasonable.

Accordingly, the Court finds that it was neither objectively excessive nor clearly unreasonable for Officers Wille and McDaniel to strike Pharr six times to get control of his left arm. See Bennett v. Britton, 609 F. App'x 11, 13 (2d Cir. 2015) (holding that a strike to the peroneal nerve in the thigh is a reasonable application of force to effectuate an arrest); Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 128-29 (2d Cir. 2009) (holding that an officer's punch to the torso did not constitute excessive force to subdue and arrest a suspect). **[*42]**

In sum, the majority of the Graham and Kingsley factors weigh in favor of the reasonableness of the officers' actions. See 490 U.S. at 396; 135 S. Ct. at 2473. The officers limited the use of force to a controlled take-down and six strikes which bears a tight relationship with the need to subdue Pharr given the circumstances described above. In contrast, the use of a taser or baton may have been excessive compared to the need in this case. Plaintiff's injuries to not appear extensive or long-lasting; a knee scrape is minor and Plaintiff has offered no evidence that his broken wrist has contributed to more complicated medical problems. The officers attempted to limit the amount of force by first touching Pharr's arm as he exited the vehicle prior to the take-down, and then while on the ground, issuing multiple verbal commands instructing Pharr to release his arm prior to using closed fisted strikes. The severity of the security problem was heightened due to the hour of night, the neighborhood, and the presence of unknown suspects in the vehicle. Finally, the officers reasonably perceived a threat based on Pharr's previous non-compliance during the traffic stop, his possession of a lit cigarette in his hand as he left **[*43]** the vehicle, the known quantity of violent crime in the instant neighborhood, and the fact that Pharr could have had a weapon in his waistband.

For these reasons, the Court finds that the two instances of force used against Pharr were objectively reasonable under the circumstances of this case.

B. Whether the Use of Force was Objectively Unreasonable in Light of Clearly Established Law

Even if the Court is mistaken, and the Officers employed unreasonable force, Plaintiff has not met his burden under the second prong of qualified immunity. The second prong of a qualified immunity analysis requires a court to decide "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232. In other words, a court must determine "whether the right was clearly established such that a reasonable officer would know that the particular level of force used was excessive." Hogan, 722 F.3d at 735 (citing Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), modified, 555 U.S. at 236).

In 2012, it was clearly established that a person had a right to be free from excessive force. Deville, 567 F.3d at 169. Still, the Supreme Court has repeatedly told lower courts "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). So, while the right to be free **[*44]** from excessive force was clearly established in a general sense, "the right to be free from the degree of force used in a given situation may not have been clear to a reasonable officer at the scene." Hogan, 722 F.3d at 735. To say that the law was clearly established, a court must be able to "point to controlling authority—or a 'robust consensus of authority'— that defines the contours of the right in question with a high degree of particularity." Morgan v. Swanson, 659 F.3d 359, 371-72 (5th Cir. 2011) (quoting al-Kidd, 563 U.S. at 742). However, this does not mean that "a case directly on point" is required. al-Kidd, 563 U.S. at 741. Instead, "existing precedent must have placed the . . . constitutional question beyond debate." Hogan, 722 F.3d at 735 (internal citation omitted) (emphasis in original). In the end, the question is whether the right is "sufficiently clear that every reasonable officer would [have understood] that what he is doing violates that right." Id. (internal citations omitted).

At the time of Pharr's arrest, the law was clearly established that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion." Bush v. Strain, 513 F.3d 492, 502 (5th Cir. 2008) (quoting Graham, 490 U.S. at 396). Yet, the permissible degree of physical coercion depends on the severity of the crime at issue, whether a suspect posed a threat to the officer's **[*45]** safety, and whether the suspect was resisting arrest or attempting to flee. Bush, 513 F.3d at 502.

(1) The First Use of Force: The Take-Down

The Court finds that Plaintiff has not met his burden to show that existing precedent at the time of the arrest placed beyond debate the question of whether the take-down amounted to a constitutional violation; the cases on which Pharr relies are distinguishable from the circumstances of this case.

Pharr first relies on Goodson v. City of Corpus Christi to show that it is clearly established law that tackling a person constitutes excessive force where the person does not attempt to flee. 202 F.3d 730, 740 (5th Cir. 2000). In Goodson, the Fifth Circuit declined to extend qualified immunity to two officers on an excessive force claim. The court concluded that because the plaintiff "suffered a broken shoulder as a result of being tackled by [the officers], who lacked reasonable suspicion to detain or frisk him and from whom he was not fleeing[,] [a] fact issue therefore exists as to the objective reasonableness of the force used." Id. The driving force of this analysis, however, was the fact that the officers lacked reasonable suspicion to detain the plaintiff or probable cause to arrest him. Here, Plaintiff **[*46]** has voluntarily dismissed his malicious prosecution and false imprisonment claims and in doing so, does not contest the reasonableness of the seizure itself, but only disputes the amount of force used to effectuate the seizure. Therefore, Goodson lacks analytical force to demonstrate a clearly established right where, like here, the reasonable suspicion or probable cause to make the seizure in the first place is not challenged. See Poole, 691 F.3d at 632 (making the same distinction). Further, in Goodson the plaintiff did not attempt to flee, but in this case Pharr admitted that he stepped away from his vehicle and the video evidence shows Pharr moving past Officer Wille. While Pharr's stepping away from the vehicle may have been slight, his decision to open the vehicle door at the initiation of the traffic stop indicated a propensity to flee, and thus gives a reasonable basis to the belief that his stepping away from the vehicle was evasive in nature.

Pharr's reliance on Brown v. Long Beach Police Dep't is also unavailing. 105 F. App'x 549, 550-51 (5th Cir. Jul. 16, 2004). First, Brown is an unpublished opinion and is not precedent pursuant to Fifth Circuit rules. See 5th Cir. R. 47.5.4. Accordingly, Plaintiff's reliance on an opinion that lacks precedential weight to **[*47]** show a clearly established law is weak at best and non-binding at worst. Second, Brown is distinguishable on the facts. In Brown, a 300-pound police officer tackled a 100-pound teenage girl causing a pelvic fracture after she fled, posed no threat, and was suspected of the nonviolent crime of truancy. 105 F. App'x at 550-51. Here, the crime of driving while intoxicated is more severe than truancy and Pharr posed a threat by holding his lit cigarette in his hand and not standing still after Officer Wille took control of Pharr's left arm. Further, the officers did have to make a split second police judgment because-accepting Pharr's version of events-he stepped out of the vehicle at approximately 3:30am in a high-crime neighborhood, possessed a lit cigarette in his hand that he admits could be used as a weapon, and took steps away from the vehicle despite the fact that Officer Wille had placed his hands on Pharr's arm. Accordingly, Brown does not create a clearly established right that would make it sufficiently clear to every reasonable officer that tackling a suspect, in the circumstances of this case, violated that right.

Accordingly, Plaintiff has failed to meet his burden of showing that the law was sufficiently **[*48]** clear that every reasonable officer would have understood that what was done to Pharr violated his right to be free from excessive force.

1. The Second Use of Force: The Strikes

Plaintiff cites no cases in support of his proposition that issuing six closed-fist strikes to Pharr's body in the circumstances of this case violated clearly established law. However, this Court's review of case law reveals that the law was either clearly established that the police officers could strike Pharr to effectuate the arrest or, in the alternative, that the law had not yet been developed, thus not placing the officers on fair notice that they could potentially be violating the law. See Poole, 691 F.3d at 629 (holding, four days after Pharr's arrest, that tasing a person who would not release his arm was a reasonable use of force); Brown v. Rinehart, 325 F. App'x 47, 51 (3d Cir. 2009) (finding that a right knee "stun blow" was objectively reasonable because a suspect had resisted verbal warnings and lay on his hands to prevent being handcuffed); Husbands ex rel. Forde, 335 F. App'x at 128-29 (holding that an officer's punch to the torso did not constitute excessive force to subdue and arrest a suspect); Bennett, 609 F. App'x at 13 (holding that a strike to the peroneal nerve in the thigh is a reasonable application of force to effectuate an arrest). **[*49]**

Accordingly, the Court finds that Plaintiff has failed to meet his burden of showing that it was sufficiently clear to a reasonable officer under the present circumstances that issuing six closed fisted strikes to effectuate the arrest of a perceived non-compliant suspect violated the Fourth Amendment.

III. State Tort Claims of Assault and Battery

Plaintiff's state tort claims fail for three reasons: (1) the Texas Tort Claims Act ("TTCA") requires dismissal of all state tort claims against the police officer, (2) the officers' actions during the arrest were reasonable, and (3) the officers are immune from suit.

A. The TTCA

The TTCA waives Texas's immunity from suit in certain circumstances. Gil Ramirez Grp., LLC v. Hous. Indep. Sch. Dist., 786 F.3d 400, 415 (5th Cir. 2015). However, "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit."

Tex. Civ. Prac. & Rem. Code § 101.106(e). The Texas Supreme Court interpreted this language to mean that "if a plaintiff brings virtually any state common law tort claim against both a governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." Bustos v. Martini Club, Inc., 599 F.3d 458, 463 (5th Cir. 2010) (citing Mission Consol. Indep. Sch. Dist. v. Garcia, 253 S.W.3d 653, 658-59 (Tex. 2008)).

In Bustos, the Fifth Circuit held that [*50] where state law claims against the municipality based on negligent hiring and supervision were joined with claims against police officer defendants for excessive force, the claims against the city were "rooted in the same alleged common law violations." 599 F.3d at 464. Thus, the Fifth Circuit held that the district court was bound to dismiss the officers pursuant to § 101.106(e). Here, Plaintiff has alleged excessive force claims in the form of an intentional tort—assault and battery—while also alleging a claim against the City of Austin for negligent hiring and supervision.[5] Based on Bustos, Plaintiff has brought the "same common law tort claim" against a governmental unit and its employees. Accordingly, the Court must dismiss the employees pursuant to § 101.106(e) because the City has moved for them to be dismissed.

B. Reasonableness of the Arrest

In the alternative, under Texas law, "[t]he actions of a police officer in making an arrest necessarily involve a battery, although the conduct may not be actionable because of a privilege." City of Watauga v. Gordon, 434 S.W.3d 586, 594 (Tex. 2014). "A police officer is privileged to use force to the degree he reasonably [*51] believes is necessary to make an arrest, taking care that the force used is commensurate with the necessity." Tex. Dep't of Public Safety v. Petta, 44 S.W.3d 575, 579 (Tex. 2001).

Here, as explained above, Officers Wille and McDaniel used an objectively reasonable degree of force to effectuate Pharr's arrest. Notably, once the need to use force ended, all parties agree that no excessive force was used once Pharr was handcuffed. (See, e.g., Pharr Dep. Tr. at 99:6-99:9.) Therefore, the force used was commensurate with the necessity under the circumstances. Plaintiff has otherwise failed to establish a genuine dispute of material fact that the degree of force used was neither reasonable nor proportionate to the need.

C. Official Immunity

---

[5] Plaintiff has voluntarily dismissed the claim for negligent hiring and supervision against the City of Austin. (Dkt. # 68.)

Official immunity is an affirmative defense that protects state government employees "from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." Rockwell v. Brown, 664 F.3d 985, 993 (5th Cir. 2011) (quoting City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994)). Texas courts have held that police officers are exercising discretion when performing their duties. City of Lancaster, 883 S.W.2d at 654 (citing Dent v. City of Dallas, 729 S.W.2d 114, 117 (Tex. App. 1986) (holding officer was performing discretionary act in deciding when and how to arrest suspect), cert. denied, 485 U.S. 977, 108 S. Ct. 1272, 99 L. Ed. 2d 483 (1988)). Texas's law of official immunity is substantially [*52] the same as federal immunity law, except Texas does not require a showing that the right alleged to be been violated was not clearly established. Cantu v. Rocha, 77 F.3d 795, 808-09 (5th Cir. 1996). Thus, Texas's test for good faith "focuses solely on the objective legal reasonableness of the officer's conduct." Rockwell, 664 F.3d at 993 (internal citations omitted).

It is undisputed that Officers Wille and McDaniel were acting within their discretion and scope of authority in conducting a traffic stop and arrest of Pharr. As explained above, the officers' use of force in conducting a take-down and applying six closed-fist strikes to effectuate an arrest was objectively reasonable under the totality of the circumstances. Therefore, the Court finds that the police officers have official immunity from suit on Pharr's state law intentional tort claims.

Accordingly, the Court will grant summary judgment in favor of Officers Wille and McDaniel on the state tort claim of assault and battery pursuant to the three aforementioned theories of relief.

IV. Municipal Liability for Chief Acevedo and the City of Austin

To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must prove three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional [*53] rights whose 'moving force' is the policy or custom. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). It is well established Supreme Court and Fifth Circuit law that a municipality may not be held liable if a plaintiff's constitutional rights were not violated. City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("[I]f the [police officer] inflicted no constitutional injury on [the plaintiff], it is inconceivable that [the city] could be liable to [plaintiff]."); Rios v. City of Del Rio, Tex., 444 F.3d 417, 425 (5th Cir. 2006) ("It is facially evident that this test cannot be met if there is no underlying constitutional

violation.") As the Supreme Court explained,

> [No case] authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

<u>Id.</u> (emphasis in original). Since Officers Wille and McDaniel inflicted no constitutional harm onto Pharr as explained above, Pharr does not have a viable claim against either Chief Acevedo, in his official capacity, or the City of Austin. Accordingly, summary judgment in favor **[*54]** of Chief Acevedo and the City of Austin is proper as a matter of law.

<u>CONCLUSION</u>

For the reasons stated, the Court **GRANTS** Defendants' Motion to Exclude the Testimony of Dr. George Kirkham (Dkt. # 29), **GRANTS** Officers Wille's and McDaniel's Motion for Summary Judgment (Dkt. # 42), and **GRANTS** Chief Acevedo's and the City of Austin's Motion for Summary Judgment (Dkt. # 41). The Court **ORDERS** this case **DISMISSED WITH PREJUDICE** in favor of Defendants.

**IT IS SO ORDERED**.

**DATE**: Austin, Texas, July 29, 2016.

/s/David Alan Ezra

DAVID ALAN EZRA

UNITED STATES DISTRICT JUDGE

**End of Document**