IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAVERIA HARPER as the Personal Representative of the Estate of ARTHER MCAFEE, JR and LORINE MCAFEE, | * * * * | |
| Plaintiffs, | * * | CIVIL ACTION NO. 2:18-CV-520 |
| v. | * * * | |
| JEFF MCANDREWS AND HARRISON COUNTY, TEXAS. | * * * | |
| Defendants. | * | |

**Supplemental Expert Report: John G. Peters, Jr., Ph.D., CTC, CLS**
209 South Stephanie Street ◆ Suite B249 ◆ Henderson, Nevada 89012
Telephone: 717.538.5940

Pursuant to Fed. R. Civ. P. 26(1)(2), I, John G. Peters, Jr., Ph.D., hereby submit my Supplemental Report that contains a complete statement of supplemental opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the supplemental opinions the exhibits or list of references I used as a summary of or support for the supplemental opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
March 16, 2020

APPENDIX "E"

**I.      CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED**: See APPENDIX A.

**II.     COMPENSATION**: Appendix B

**III.    FOCUS OF ANALYSIS**

Through counsel for Plaintiffs Laveria Harper (Ms. Harper) and Lorine McAfee (Ms. McAfee), I was asked to review documents produced in discovery, certain pleadings, and other documents and then analyze training standards, public safety standards, police practices, uses of force, conduct, in addition to related issues and then offer opinions about same. The analyses and opinions developed are contained within this report.

I am retained to provide expert opinions in the above areas of law enforcement practices. I am not a party to this litigation. A copy of my *Curriculum Vitae* is attached to this report, which identifies my education, professional experience, over 250 publications, and other training and experience. There are areas of my education, training, and experience that are very relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical).

I am a graduate of the TASER M26™ and X26™ ECD Instructor programs who has taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the TASER X3™ ECD instructor program, the TASER XREP™ instructor program, the TASER X12™ instructor program, the TASER AXON™ instructor program, the TASER Evidence.com program, and have authored several articles about TASER ECD and related devices.

**IV.    RIGHT TO AMEND**

I reserve the right to amend and/or supplement these opinions if additional information becomes available, or in response to expert disclosures of the defendant or plaintiff, or if questions are asked of me that do not relate to information contained in this disclosure.

**V.     SUPPLEMENTAL OPINION STANDARDS**

Expressed supplemental opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## VI. SUPPLEMENTAL OPINION METHODOLOGY

The supplemental opinions are developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study.

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## VII. SUMMARY of SUPPLEMENTAL OPINIONS

1. **Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issueing a written policy and procedure on responding to individuals with mental illness, thereby falling below national policy standards, recommendations, and guidelines.**

2. **Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issuing a written policy and procedure on the uses and requalification requirements for those deputies who are issues and/or carry and use TASER® electronic control weapons (ECWs), which falls below national policy standards, recommendations, and guidelines.**

3. **Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issuing a written policy and procedure and then conducting training of deputies about the Americans With Disabilities Act (ADA), which falls below national policy standards, recommendations, and guidelines.**

4. **Sheriff McCool has a policy, practice, and/or custom of failing to conduct thorough internal and/or administrative investigations, in this case into the fatal shooting of Mr. McAfee by Deputy McAndrews and failed to identify and correct systemic failures within the Harrison County Sheriff's Department.**

5. **Forensic evidence challenges Deputy McAndrews' version of the facts about aiming at Mr. McAfee's chest area with a TASER ECW.**

6. **Deputy McAndrews purposively fails to provide cardiopulmonary resuscitation (CPR) to Mr. McAfee after willfully shooting him because he isn't trained to perform CPR by Harrison County and/or Sheriff McCool, or deliberately refused.**

7. **Deputy McAndrews knows he is responding to a welfare check that involves a person with mental illness and fails to request a back-up officer and/or wait for back-up to arrive to assist on the call, thereby creating his own dangerous situation that he then used deadly force as an escape option.**

VIII. DISCUSSION of SUPPLEMENTAL OPINIONS

1. **Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issueing a written policy and procedure on responding to individuals with mental illness, thereby falling below national policy standards, recommendations, and guidelines.**

Sheriff McCool testified, "There's **not a specific written policy** that would state if the welfare check involves a **person with a mental problem**, to deviate from our normal course of business" [emphasis added] (McCool deposition, 35:12-15). Per Sheriff McCool, a "normal course of business" for deputies who respond to a welfare check is to assume the person is dead. "Most of my officers -- in fact, all of my officers, including me, would go there with a fairly strong presumption that the individual is probably deceased.··And that's very common" (35:20-23). This custom, practice, and policy of "complacency" when dispatched to welfare checks will make deputies overreact when they face a person who is not deceased because of the agency-proliferated and reinforced mindset. Such a mindset is unacceptable in today's society given the frequency of mental health calls for service to which law enforcement officers respond in the last decade. The failure to have a written policy is a leadership failure not only on the part of Sheriff McCool, but also on the leadership of Harrison County and/or Judge Taylor. Sheriff McCool testified he is the chief policy maker for the Harrison County Sheriff's Department (51:10).

Sheriff McCool also confirmed my October 2019 Preliminary Opinion that he, Harrison County, and/or Judge Taylor failed to write and issue a written policy on how deputies are to respond to welfare checks, when he testified there he has no such written policy (McCool deposition, 37:22; 63:11). I reiterate and adopt my October 2019 Preliminary Report opinion about this failure: "A police welfare check is a significant law enforcement function because it allows for professional intervention if an individual is in distress or need of assistance because of a health condition, injury or some other situation" (https://legalbeagle.com/5823955-police-welfare-check.html)" (p. 11).

Per the National Alliance of Mental Illness (NAMI), "19.1% of U.S. adults experienced mental illness in 2018 (47.6 million people). This represents 1 in 5 adults. Additionally, 4.6% of U.S. adults experienced serious mental illness in 2018 (11.4 million people). This represents 1 in 25 adults" (https://www.nami.org/learn-more/mental-health-by-the-numbers). Based upon the population of mentally ill individuals, it is known that law enforcement officers will frequently encounter such individuals, many of whom qualify as being disabled per the ADA. Contemporary law enforcement executives, such as Sheriff McCool, know they must train their

Deputies about the ADA, about mental illness, and how to make reasonable accommodations for these individuals when coming into contact with them.

According to the **Standards for Law Enforcement Agencies** (November 2001), training is noted as one of the most important responsibilities and duties of a law enforcement agency. According to the Commission on Accreditation for Law Enforcement Agencies (CALEA), "well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations" (p. 33-1).

Reuland, Schwarzfeld, and Draper (2009) reported "[t]he current body of research provides a window into how specialized law enforcement responses to people with mental illnesses can contribute to greater safety for all those involved in encounters and provide better long-term results" (p. 15). Reuland and Schwarzfeld (2008) reported "*specialized law enforcement-based response programs* position officers to safely manage these complex encounters and provide a compassionate response that prioritizes treatment over incarceration when appropriate" (pp. 1-2). Morabito, Kerr, Watson, Draine, Ottati, & Angell (2012) reported "a CIT officer is likely to respond with less force for an increasingly resistant demeanor in comparison with non-CIT officers" (p. 71).

Given the high rate of calls involving people with mental illness that Harrison County Sheriff's Department respond to in the scope of their duties, Sheriff McCool needed to develop a written policy on how to interact with those who have mental health issues, and then train his deputies on the policy and also provide training about mental illness. Based upon my education, training, and experience, Sheriff McCool made a purposeful decision not to write and publish a mental health policy that will assist his deputies in the appropriate handling of those individuals with mental illness. Similarly, Sheriff McCool made a purposeful decision not to train his deputies on how to appropriately handle individuals with mental illness. These policy and training failures were a material cause in the fatal shooting of Mr. McAfee.

Defendants' police practices expert, Robert Vine (Mr. Vine) contradicts Sheriff McCool's testimony about training deputies on Harrison County mental illness and welfare checks, and also contradicts the Harrison County Sheriff's Department policy manual. "As for the allegations against Harrison County for failure to train, supervise, and /or discipline, I [Mr. Vine] find no evidence to support these claims" (Bates Stamp, DEF05369). Mr. Vine's opinion is nothing short of blatantly ignoring contradictory testimony, lack of evidence, and demonstrates his naivete on these subjects to simply justify the poor leadership of Sheriff McCool, Harrison County, and/or Judge Taylor. Mr. Vine cannot produce or refer to a policy within the Sheriff's Department manual that specifically focuses on "mental illness" or conducting "welfare checks." Further, he cannot refer to, nor does he cite to, any lesson plan developed by Harrison County and/or another Texas training organization that was used to train Harrison County deputies in these subjects, with specific reference to Harrison County Sheriff's Department policy and procedure.

**2.      Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issuing a written policy and procedure on the uses and requalification requirements for those deputies who are issues and/or carry and use TASER® electronic control weapons (ECWs), which falls below national policy standards, recommendations, and guidelines.**

Sheriff McCool testified, "Once they [deputies] are certified and -- and meet that basic certification expertise, then they -- they receive no further training [in the uses of a TASER ECW] (McCool deposition, 55: 11-13). In other words, Sheriff McCool believes there is no need for requalification training or update training on a TASER ECW, which falls far below career and technical education training standards, and the TASER manufacturer's training recommendations. There is also no written policy on the use of a TASER ECW (52:8), which also falls below national policy standards, recommendations, and guidelines.

A written TASER policy must be written before a Harrison County deputy can be trained in what procedures and guidelines are to be followed. Sheriff McCool demonstrates his poor leadership by failing to develop and issues a TASER policy (along with the other mentioned policies). TASER policies are available from many organizations, including the International Association of Chiefs of Police (IACP). The IACP policy on TASER use was available since 2009 (see below):

ELECTRONIC CONTROL WEAPONS

**Model Policy**

| Effective Date | | Number | |
|---|---|---|---|
| August 2009 | | | |
| Subject | | | |
| Electronic Control Weapons | | | |
| Reference | | Special Instructions | |
| Distribution | Reevaluation Date | | No. Pages |
| | August 2010 | | 3 |

(IACP, Model Policies, 2009).

As early as 2008, the manufacturer of TASER products advised all law enforcement administrators that they were responsible for training, not the manufacturer:

[2] Law enforcement agencies are responsible for their own policies, training, and standards. TASER has no power or authority to mandate or require training; to recommend, establish, and/or set policy; or to establish standards of conduct.

(Taser International, Inc., Product Warnings: Law Enforcement, April 28, 2008, p. 1).

Further, the manufacturer told agency administrators who adopted TASER ECW's that it was up to them to dovetail the use of TASER ECWs into agency use-of-force policy.



(Taser International, Inc., TASER Training PowerPoint slides, V. 17, May 2010).

TASER ECW training warns about using the ECW on individuals who may be metabolically or physiologically compromised, and specifically tells users to "Follow your agency's Guidance . . ." which Deputy McAndrews could not do because Sheriff McCool, Harrison County, and/or Judge Taylor failed to develop such a policy.

(Taser International, Inc., TASER Training PowerPoint slides, V. 17, May 2010).

Per the IACP, minimum training topics include, but are not limited to:

**D. Training Requirement**

Officers must be properly trained before being issued and using an ECW. Failure to provide professionally accepted training exposes the officer, agency, and the public to an increased potential for negative outcomes. The training provided should, at a minimum, be consistent with the manufacturer's recommendations and agency policy, and at least address the following topics.

- Design and functioning of each device.

Dr. Peters' Supplemental Report: Harper v. McAndrews, et al.
©2020. A.R.R.

- Proper method of carry, use, and activation of the device.
- Proper method of storage and maintenance of the device.
- Practical application and operational use of the device, including loading, unloading, and live fire, to include aiming consistent with manufacturer recommendations, and marksmanship drills that include fixed sights as well as laser/fixed sighting combined.
- Rules of use and engagement, with special emphasis on the manner in which the device is carried and accessed. Since some models are designed to be worn on the duty belt, this policy and related training must ensure that the service handgun is never accidentally drawn instead of the ECW. This has occurred in several documented cases at least one of which resulted in the fatality of a suspect.
- Specific requirements for supervisory notification and documentation of the incident, including those concerning photography.
- Removal of darts.
- Preservation of the discharged darts, cartridges, and the confetti-like, serial numbered anti-felon identification (AFID) tag samples as evidence.
- Medical evaluation of those exposed to the device.
- Role-playing scenarios to test the officer's decision-making capabilities, as they relate to the issues outlined above.

(IACP, Electronic Control Weapons: Concepts and Issues Paper, April 2010, p. 4).

Defendants' expert, Mr. Vine, failed to comment on the lack of Harrison County and/or Sheriff McCool's lack of written policy on TASER ECW, responding to individuals with mental illness, and/or responding to welfare checks. Possibly, Mr. Vine isn't an expert in these areas and/or fails to have training in the need for such policies and procedures.

In contrast, Mr. Vine may have not opined because he knows such written policies are required by municipalities and/or agencies, and quite possibly has them in his law enforcement agency. If he knows the importance of having such written policies and the need to train deputies in such policies and he fails to discuss it, he is being disingenuous and helping to perpetuate poor leadership in law enforcement agencies such as the Harrison County Sheriff's Department and/or Harrison County. It appears Mr. Vine shared Sheriff McCool's training and management paradigm about ECW training: once trained, one is trained for life!

> **3. Sheriff McCool, Harrison County, and/or Judge Taylor failed to guide and limit deputy discretion by developing and issuing a written policy and procedure and then conducting training of deputies about the Americans With Disabilities Act (ADA), which falls below national policy standards, recommendations, and guidelines.**

The ADA is recognized by many individuals as the second most important civil rights legislation passed by the United States government. Its importance did not cause Sheriff McCool, Harrison County, and/or Judge Taylor to develop an ADA training program for deputies who are expected to interact with and have interacted with disabled individuals. Such interaction with disabled individuals is a *core task* of law enforcement officers, and therefore

Dr. Peters' Supplemental Report: Harper v. McAndrews, et al.
©2020. A.R.R.

they must be trained by their municipalities on how to make reasonable accommodations, contacting such individuals, etc. (see *Canton v.* Harris, 489 U.S. 378 (1989)). These policy and training failures by Harrison County, Sheriff McCook, and/or Judge Taylor fall below national training recommendations, standards, and guidelines.

Sheriff McCool, as the chief policy maker of his agency, failed to request training for his deputies on ADA subjects and guidelines because he "never thought about it . . ." (McCool deposition, 54:9). Defendants' expert, Mr. Vine, failed to comment on ADA policy and training, possibly, because he, too, probably never thought about it or fails to understand ADA.

4. **Sheriff McCool has a policy, practice, and/or custom of failing to conduct thorough internal and/or administrative investigations, in this case into the fatal shooting of Mr. McAfee by Deputy McAndrews and failed to identify and correct systemic failures within the Harrison County Sheriff's Department.**

Sheriff McCool testified, "we did not conduct a formal internal investigation" (McCool deposition, 70:23-24). This important failure demonstrates Sheriff McCool's poor leadership, and his lack of caring to identify and correct systemic failures within his agency. It also falls below national investigation standards, recommendations, and guidelines. Conducting a thorough internal investigation will identify systemic failures and other areas for improvement, such as not having sufficient policies, or not having a surveillance system in place. A collateral result of such an internal investigation for agency leadership, in this case Sheriff McCool, to improve the system, correct deficiencies, and take proactive steps to ensure these failures, weaknesses, and insufficiencies are corrected.

Instead of conducting an internal investigation into the fatal shooting of Mr. McAfee, Sheriff McCool asked the Texas Department of Public Safety to investigate the event, whose focus is on criminal violations, not internal issues (McCool deposition, 71:1-2). As I opined in my 2019 preliminary report, regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency" (CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity and discipline of each employee" (p. 52-1).

The International Association of Chiefs of Police (IACP) issued guidelines for the investigation of employee misconduct and also published a model policy regarding such investigations (IACP, "Investigation of Employee Misconduct: Model Policy", July 2001). Regarding the disposition of a citizen complaint, the IACP recommends that: "The primary investigative authority for the investigation (i.e., subject employee's supervisor and commander or OPS) shall review the complaint report and investigate findings once deemed complete. This authority will compile a report of findings and provide a disposition recommendation for each charge as follows:
    a.    *Sustained*: Evidence sufficient to prove allegations.
    b.    *Not sustained*: Insufficient evidence to either prove or disprove allegations.
    c.    *Exonerated*: Incident occurred but was lawful.

   d. *Unfounded*: Allegation is false or not factual or the employee was not involved (p. 3).

  In addition to his failing to perform an internal investigation, Sheriff McCool failed to instruct investigators to collect DNA evidence from Deputy McAndrews' TASER ECW to see if Mr. McAndrews had touched it as claimed by Deputy McAndrews. This is a vital piece of potential forensic evidence and one that any competent administrator and/or investigator would want to identify.

  Similarly, the body-worn camera video footage of Deputy McAndrews was not forensically analyzed to decompress the content in an effort to see if anything else is shown on the footage. This is an important aspect of the investigation—criminal and civil—and should not be overlooked or not attempted.

  **5.** **Forensic evidence challenges Deputy McAndrews' version of the facts about aiming at Mr. McAfee's chest area with a TASER ECW.**

  As noted in my 2019 preliminary report, Deputy McAndrews told investigators "he targeted the chest area of Arthur McAfee" (Bates Stamp, DEF01283). As I explained in my 2019 report, if Deputy McAndrews did aim at Mr. McAfee's chest area, this violates ECW target areas. Defendants' expert, Mr. Vine, who is not a TASER instructor, opined, "In a memo accompanying the bulletin,Taser (sic) officials point out that officers can still shoot the TASER at a suspect's chest, if needed" (Bates Stamp, DEF05367). Mr. Vine appears to be relying on old ECW warnings, and also has not evaluated the forensic photographic evidence.

  While the trier of fact will determine credibility issues, a careful review of the photographic evidence clearly shows one ECW probe attached to Mr. McAfee's blue jean trousers (see below photographs). If Deputy McAndrews' did shoot Mr. McAfee in the chest with one or two ECW probes, how did one probe attach to Mr. McAfee's trouser? Neither the criminal investigator, Mr. Vine, and more importantly Sheriff McCool, have explained this forensic evidence. This evidence strongly challenges the veracity of Deputy McAndrews' description of where he aimed his TASER ECW.



Defendants' expert, Mr. Vine, fails to discuss this evidence in his report.



Dr. Peters' Supplemental Report: Harper v. McAndrews, et al.
©2020. A.R.R.


DEF01837

    The photographs show the probe and the ECW cartridge with wires extended and enveloped with Mr. McAfee's trousers. The photographic evidence shows one ECW probe attached to the trouser leg of Mr. McAfee's trouser leg, the ECW wires extended, and the ECW cartridge wrapped in his cut trouser leg (2 photos, DEF01836 and 01837). If these photographs accurately show the location of one ECW probe, then Deputy McAndrews' claim that he aimed at Mr. McAfee's chest area is patently wrong. The photographs show the ECW cartridge is removed from the ECW. These photographs support what EMS responders described at the scene.

    EMS responders reported the following upon their arrival inside the McAfee residence:

> ENTERED RESIDENCE AND VISUALLY INSPECTED SCENE IN ORDER TO ATTEMPT TO PRESERVE SCENE. PT FOUND LAYING SUPINE ON BEDROOM FLOOR. PT WAS HANDCUFFED WITH HANDS IN FRONT. TAZER WIRING, PROBES, AND CARTRIDGE ON AND AROUND PATIENT. MONITOR LEADS

(Bates Stamp, DEF02264).

    EMS responders documented the TASER ECW wires, probes, and cartridge was "on and around [Mr. McAfee], without any ECW probe being attached to Mr. McAfee's chest area. The

EMS report coupled with the photographic evidence highlights a serious discrepancy about Deputy McAndrews' claim of where he targeted Mr. McAfee.

Lorine McAfee, sister to Mr. McAfee, told investigators she actually pushed the ECW to the door, prior to Deputy McAndrews shooting her brother, which is supported by photographic evidence of a TASER ECW without a cartridge next to a side door of the residence. The cartridge is shown missing from the ECW.

Ms. McAfee testified:

> 12. As Defendant McAndrews was holding Arther's arms above his head trying to put Arther's hands in handcuffs, Defendant McAndrews instructed Arther to "turn over on his belly". As I was holding Arther's feet, I glanced up to see which way to help Arther turn and noticed that McAndrews was still holding Arther's hands above his head. I personally observed Defendant McAndrews unholster his gun and placed it in Arther's chest at point-blank range and heard two gun shots. I told Defendant McAndrews "you shot him." Moments prior to the time Defendant McAndrews shot Arther, he was not threatening Defendant McAndrews or any other person, did not have any weapons in his hands and was not harming Defendant McAndrews. I

(Bates Stamp, AM000009).

> 3  LORINE McAFEE: And I think, I'm not for sure, if
> 4  that taser -- what all it was. I don't know if it was glasses
> 5  and tasers, but it was, you know, like somewhere over there by
> 6  the bathroom door because I kind of moved out of the way.

(L. McAfee Interview transcript, p. 17).

The question of how Deputy McAndrews' TASER ECW was on the floor and next to a side door across from a washer and dryer is a major forensic issue that must be resolved. To use a drive stun on Mr. McAfee, Deputy McAndrews had to remove the ECW cartridge from the front of the ECW and then press the ECW contact points (located on the front of the ECW) against Mr. McAfee's body. Removing an ECW cartridge that had a probe deployed would not remove the probe from its target unless the cartridge was thrown with enough force to pull out the probe and there is no evidence that Deputy McAndrews threw the ECW cartridge.

When a TASER ECW is associated with an arrest-related death, investigators must, in this case, determine how the probe got stuck into Mr. McAfee's trouser leg, and how the ECW

got positioned on its side, on a floor, and by an open side door. If they cannot determine this in their criminal investigation, then it becomes an important issue to be explained during the internal affairs investigation. Sheriff McCool testified he is not trained in the uses of a TASER ECW, and therefore it is likely he would not know what questions to ask of Deputy McAndrews (McCool deposition, 69:23).



Deputy McAndrews' TASER ECW on the floor, without a cartridge, lying near a side door.



Another view of the TASER ECW lying on the floor.

6. **Deputy McAndrews purposively fails to provide cardiopulmonary resuscitation (CPR) to Mr. McAfee after willfully shooting him because he isn't trained to perform CPR by Harrison County and/or Sheriff McCool, or deliberately refused.**

Dr. Peters' Supplemental Report: Harper v. McAndrews, et al.
©2020. A.R.R.

Deputy McAndrews fails to perform CPR on Mr. McAfee after shooting him, which is documented in the EMS report:

> AND NO CPR HAD BEEN PERFORMED AND TO ENTER THROUGH REAR OF RESIDENCE.

(Bates Stamp, DEF02264).

Other than requesting an ambulance, Deputy McAndrews fails to perform any medical intervention, such as CPR, on Mr. McAfee but did handcuff him (Bates Stamp, DEF01645). Deputy McAndrews told investigators he only checked Mr. McAfee for a pulse and found a weak one, and then waited for EMS to arrive (Bates Stamp, DEF01661). The Texas Commission of Law Enforcement offers a two-hour CPR program:

| 3845 | CPR | | 2 | 16 |
|---|---|---|---|---|

https://www.tcole.texas.gov/content/specific-course-reporting-numbers

Based upon my education, training, and experience, Deputy McAndrews created a special relationship with Mr. McAfee when he contacted him and then used deadly force on him. These actions require Deputy McAndrews to perform CPR on Mr. McAfee as an appropriate medical intervention, and not to stand there, do nothing, and watch him die. If Harrison County and/or Sheriff McCool had a custom, practice, or policy of not training and certifying their law enforcement officers in CPR, this is a conscious choice among other choices, and also put co-workers at greater medical risk if they have a heart attack, as well as the general public. Deputies, as first responders, are often the first ones to arrive at an event where there is a medical emergency. Having taken a five-second TASER ECW application, I know there is pain associated with its coming into contact with the body. Based upon my person experience and other literature, the application of the ECW to Mr. McAfee caused pain, and shooting him without administering CPR made him suffer.

7.  **Deputy McAndrews knows he is responding to a welfare check that involves a person with mental illness and fails to request a back-up officer and/or wait for back-up to arrive to assist on the call, thereby creating his own dangerous situation that he then used deadly force as an escape option.**

Deputy McAndrews told investigators he was dispatched to a residence where there was possibly a person with mental illness (Bates Stamp, DEF01660). He also said that if he had known there was a person with mental illness in the residence, he would have requested "another unit" go with him (DEF01660).

The Dispatch transcript shows Deputy McAndrews knew he was being sent to a residence with a person who had some sort of mental illness (Bates Stamp, DEF01576). Knowing this information, Deputy McAndrews fails to ask for back-up and fails to wait for

Dr. Peters' Supplemental Report: Harper v. McAndrews, et al.
©2020. A.R.R.

back-up, which can give him another set of eyes and ears on the call and provide a showing of more officer presence.

Based upon my education, training, and experience, Deputy McAndrews fails to request back-up officers to assist him on the call, and then creates a danger situation when he confronts Mr. McAfee, which he uses deadly force as an escape option. Tactically, Deputy McAndrews failed to follow and implement appropriate officer safety training when responding to and interacting with a mentally ill person such as Mr. McAfee. A basic tenant of interacting with a person in crisis is to calm the person (Kenyon, 2019; IACP, 2018; Reuland & Schwarzfeld, 2008; Matthews & Rowland, 1964; Morabito, Kerr, Watson, Draine, Ottati, & Angell, 2012; Texas Commission on law Enforcement Officer Standards and Education, n.d.).

Based upon my education, training, and experience, the failure of Deputy McAndrews to request back-up and/or wait for back-up before contact Mr. McAfee who was reported to have mental illness, was a material cause in the fatal shooting of Mr. McAfee by Deputy McAndrews.

## XI. DEMONSTRATIVE EVIDENCE

I reserve the right to use demonstrative evidence at trial, including Sergeant Shannon's body-worn camera video and audio recordings, and any combination of them (including closed captioned and annotated versions of them combined) to illustrate the facts and my preliminary opinions expressed above.

## XII. COMPENSATION: See APPENDIX C.

## REFERENCES

City of Canton, Ohio v. Harris, et al, 489 U.S. 378, 109. S.Ct. 1197 [1989].)

Commission on Accreditation for Law Enforcement Agencies. (2001, November). **Standards for law enforcement agencies** (4th ed.). Fairfax, VA: Author.

Graziano, A. M., & Raulin, M. L. (2000). **Research methods: A process of inquiry** (4th ed.). Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (1997). **Research methods: A process of inquiry** (3rd ed.). New York: Longman.

IACP National Law Enforcement Policy Center. (2010, April). Electronic Control Weapons: Concepts and Issues Paper. Alexandria, VA: IACP.

International Association of Chief of Police (IACP). (2018, August). Model Policy: *Responding to persons Experiencing a Mental Health Crisis.* Alexandria, VA: Author.

Matthews, R. A., & Rowland, L. W. (1964). **How to recognize and handle abnormal people: A manual for the police officer**. New York: The National Association for Mental Health, Inc.

Morabito, M.S., Ker, A. M., Watson, A., Draine, J., Otati, V., & Angel, B. (2012). Crisis Intervention Teams and People With Mental Illness: Exploring the Factors That Influence the Use of Force. *Crime & Delinquency, 58(1)*, 57-7.

Reuland, M., & Schwarzfeld, M. (2008). *Improving Responses to People with Mental Lines: Strategies for Effective Law Enforcement Training.* New York: Council of State Governments Justice Center.

Reuland, M., Schwarzfeld, M., & Draper, L. (2009). *Law Enforcement Responses to People with Mental Illnesses: A guide to Research-Informed Policy and Practice*. New York: Council of State Governments Justice Center.

Texas Commission on Law Enforcement Officer Standards and Education. (n.d.). Crisis Intervention Training, Course Number 3841.

## APPENDIX A

## CASE DOCUMENTS REVIEWED and/or CONSIDERED

## Harper v. McAndrews, et al.



3rd Supp Disclosures a... nation



4th Supplemental Disclosures



Resp to 2nd RFP

# APPENDIX A

# COMPENSATION

# Harper v. McAndrews, et al.

**Compensation**

     I will invoice at my published supplemental report flat rate of $1800. Deposition testimony is invoiced at a flat daily rate of $2000.00 per day, if the deposition is taken at my location <u>and pre-paid</u>, with receipt 10 business days prior to the deposition or $3000.00 if taken other than at my location, or not pre-paid, plus direct expenses. On-site visits are invoiced at $3000.00 per day, plus direct expenses. Time for trial testimony is invoiced at $2000.00 per day at my location, or $3000.00 per day other than at my location, plus direct expenses.