IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **LAVERIA HARPER as Personal** | § | |
| **Representative of the Estates of Arther** | § | |
| **McAfee, Jr. and Lorine McAfee** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Case No. 2:18-cv-00520-RSP** |
| **v.** | § | |
| | § | |
| **JEFF MCANDREWS and HARRISON** | § | |
| **COUNTY, TEXAS,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM ORDER

This case arises out of the tragic death of Arther McAfee on January 20, 2018.  Mr. McAfee

was shot and killed by Harrison County Deputy Sheriff Jeff McAndrews during a welfare check

at Mr. McAfee's home requested by his sisters.  On June 15, 2020, the Court heard oral argument

on three motions. The first was the Motion to Strike Portions of Plaintiff's Evidence Attached to

Plaintiffs' Replies to Defendants' Motions for Summary Judgment ("Motion to Strike") filed by

Defendants Harrison County, Texas and Sgt. Jeff McAndrews. (**Dkt. No. 143**). The second was

Harrison County's Motion for Summary Judgment. (**Dkt. No. 100**). The third was Sgt.

McAndrews' Motion for Summary Judgment. (**Dkt. No. 101**). At the hearing the Court ruled,

regarding the Motion to Strike, that the affidavit of Lorine McAfee will not be admitted as part of

the summary judgment record, but the recorded interview of Lorine McAfee conducted by the

investigating Texas Ranger just after the shooting will be admitted as part of that record. (Dkt. No.

157).

Harrison County's MSJ seeks summary judgment regarding all of Plaintiff Laveria Harper's claims, which include claims of certain inadequate policies, as well as failures in supervision, training and discipline.  The motion also challenges the validity of the "bystander" claim brought by Lorine McAfee, who died from unrelated causes after suit was filed. (Dkt. No. 100 at 1). Sgt. McAndrews' MSJ seeks summary judgment based on qualified immunity as to all claims asserted against him in Harper's Fifth Amended Complaint. (Dkt. No. 101 at 1).

## I.      BACKGROUND

On the morning of January 20, 2018, the Harrison County Sheriff's office received a telephone request from the McAfee family to conduct a welfare check because they had not heard from Mr. McAfee for a couple of days. Sgt. McAndrews was dispatched to the residence where he was met by Mr. McAfee's sister, Lorine McAfee, who lived next door and had a key. As shown on Sgt. McAndrews' body camera, they entered the residence together, announcing who they were and that they just wanted to check on him.  Mr. McAfee answered from the back bedroom but gave confusing answers, stating that he did not know where he was.  Within seconds after Sgt. McAndrews reached the bedroom door, where Mr. McAfee was seated on the edge of his bed, Mr. McAfee angrily attacked Lorine McAfee, knocking her to the ground and hitting her with his fists many times.[1]  Sgt. McAndrews discharged his taser immediately but it did not stop Mr. McAfee. A struggle ensued in the narrow hallway, knocking off the body camera and leaving only audio for about two and a half minutes before Sgt. McAndrews discharged his pistol twice. During those two minutes, the Sgt. can be heard repeatedly telling Mr. McAfee to turn on his stomach and also to let go of the taser, which can be heard discharging several times. However, it is impossible to

---

[1] Both the body camera video of Deputy Castillo (Dkt. No. 143-5), and the interview of Lorine McAfee by Ranger Mason (Dkt. No. 100-3 at 11) show that she was not physically injured by her brother or the deputy.

know who was doing what. Mr. McAfee became unresponsive almost immediately and died as a result of the gunshot wounds.

Plaintiff makes much of the fact that Mr. McAfee was in his early 60's, used a walker, and was on disability, whereas Sgt. McAndrews was 40 and in good health.  Given the agitation displayed by Mr. McAfee on the video, the Court does not find that those bare facts greatly inform the analysis of the relative threat presented, especially since the real question has to do with whether Mr. McAfee possessed the taser when the shots were fired.  Similarly, Defendants make much of the ballistic evidence.  The Medical Examiner reported finding that the first bullet entered Mr. McAfee's chest from the front and in a "slightly upward" direction.  The second bullet was said to enter the chest from a "downward" direction. (Dkt. No. 100-3 at 22).  To translate that evidence into the positions of the parties at a given time requires a weighing of evidence that is simply not appropriate on a summary judgment motion.

## II.    MOTION TO STRIKE

Complicating the picture further is the fact that Lorine McAfee has died since the filing of suit.  Early in the case she signed an affidavit prepared by counsel but there is a clear line of authority holding that the affidavit of a dead person may not be considered on a motion for summary judgment.  *E.g.*, *Thorson v. Aviall Services, Inc.*, 2018 WL 1426971 (N.D. Tex. 3/22/2018); *Reinhardt v. Key Risk Management, Inc.*, 203 WL 292176 (N.D. Tex. 2/6/2003) ("the affiant here would not be available to present the evidence through direct testimony, and the affidavit itself would be objectionable hearsay at trial."); *Tatum v. Cordis Corporation*, 758 F.Supp. 457, 463 (M.D. Tenn. 2/14/1991)("Hearsay evidence may be considered by the Court in response to a motion for summary judgment as long as the out-of-court declarant would be available to present the evidence through direct testimony.").  The cases rely on the language of

Rule 56(c)(4) that affidavits relied upon must "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify … ."

Plaintiff does not dispute this line of cases but argues the application of the residual exception in Rule 807, which merely requires that the evidence be supported by circumstantial guarantees of trustworthiness and be more probative than any other available evidence.  The Court finds that neither circumstance exists here.  Lorine's affidavit (Dkt. No. 119-7) is clearly written by lawyers, rather than in her own words.  A simple comparison with her recorded interview makes that conclusion indisputable.  Furthermore, it is inconsistent with her interview in certain potentially important respects.  Those two facts detract from the affidavit's trustworthiness and show that it is less probative than the recorded interview.   Accordingly, the motion to strike the affidavit is granted.

However, the Court does find that the requirements of Rule 807 are met by the recorded interview that Texas Ranger Joshua Mason conducted with Lorine McAfee at the scene only two hours after the shooting.  She wasn't under oath but she undoubtedly appreciated the solemnity of an interview with a Texas Ranger investigating a shooting that she witnessed.  While she is not subject to cross-examination, the questioner was someone aligned with the Defendants who shared many of their legal interests.  A good argument can be made that Lorine was still under the stress of the excitement, within the meaning of Rule 803(2), of witnessing the fatal shooting of her brother while she was right next to him.  That itself is a circumstantial guarantee of trustworthiness recognized as an exception to the hearsay rule.  While the interview is a little too far removed from the shooting to qualify as "immediately after" the event, it also shares some of the guarantees that undergird the present sense impression exception of Rule 803(1).  Considering all circumstances,

the Court finds that the recorded interview (Dkt. No. 143-2) is admissible as an exception to the hearsay rule, and the motion to strike it is denied.

The Court will also deny the motion to strike the affidavits of the three siblings of Lorine and Arther McAfee.  (Dkt. Nos. 143-7, -8, & -9).  However, the Court will not consider the hearsay statements of Lorine that are found within each of the affidavits.

## III.    LEGAL STANDARD

### a.  Summary Judgment

If the movant establishes that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law, summary judgment may be granted. Fed. R. Civ. P. 56(c). Facts are material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact creates a genuine issue if the jury could reasonably resolve the factual dispute in favor of the nonmovant. *Id.* at 249.

Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Courts must refrain from making credibility determinations. *Choe v. Bank of America, N.A.*, 605 Fed. Appx. 316, 320 (5th Cir. 2015);  *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). However, greater weight is assigned even at summary judgment to facts evidenced in video recordings taken at the scene. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011);  *Scott v. Harris*, 550 U.S. 372 (2007).

Summary judgment is entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

movant bears the initial burden of identifying those portions of the record they believe demonstrate the absence of a genuine issue of material fact. *Id.*

If the initial burden is met, the nonmovant must show beyond the pleadings that specific facts exist which create a genuine issue for trial. *Little*, 37 F.3d at 1075. The nonmovant must identify specific evidence in the record and explain how that evidence supports their claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

### b.  Underlying Fourth Amendment Violation

A county is liable if it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978). If there is no underlying constitutional violation, there is no municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### c.  42 U.S.C. § 1983 Liability

Section 1983 provides a federal cause of action against those who, under color of state law, deprive a United States citizen of "any rights, privileges, or immunities secured by the Constitution and laws." County liability under § 1983 requires (1) an official policy; (2) promulgated by a final policymaker; (3) that is a moving force behind the violation of the constitutional right. *Monell*, 436 U.S. at 694.

A single incident of unconstitutional activity will not suffice to hold a municipality liable unless a plaintiff establishes that it was caused by an existing unconstitutional "official policy." *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989). Official policy is either an officially adopted policy or a widespread practice so common as to constitute a custom that fairly represents municipal policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1985). A single

incident of a violation "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997).

### d.  Inadequate Training

For an inadequate training claim, plaintiffs must establish (1) an inadequate training policy; (2) deliberate indifference in adopting the training policy; and (3) that the inadequate training policy directly caused the plaintiff's injury. *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992). Deliberate indifference in adopting the training policy is found when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

When a municipality relies on the minimum training required by Texas law, the plaintiff must show that "this legal minimum of training was inadequate to enable the deputies to deal with 'usual and recurring situations' faced by . . . police officers." *Benavides*, 955 F.2d at 973. "Standing alone, an expert's opinion is generally not enough to establish deliberate indifference." *Thompson v. Upshur County, TX*, 245 F.3d 447, 459 (5th Cir. 2001).

"Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Thompson*, 245 F.3d at 459, citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998) and *Thompkins v. Belt*, 828 F.2d 298, 304-05 (5th Cir. 1987). Generally, the plaintiff must demonstrate at least a pattern of similar violations. *Id.*, citing *Snyder*, 142 F.3d at 798. The inadequacy of training must be obvious and obviously likely to result in

constitutional violation. *Id.*, citing *City of Canton*, 489 U.S. at 390 and *Snyder*, 142 F.3d at 799. The standard to impose municipal liability for a single incident is "extremely narrow" and requires proof "that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (emphasis in original).

### e.  Inadequate Supervision, Discipline & Ratification

For an inadequate supervision allegation, plaintiffs must establish (1) the supervisor failed to supervise; (2) a causal link exists between the failure to supervise and the violation of rights; and (3) failure to supervise amounts to deliberate indifference. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).

Proof of more than a single incident of a constitutional violation caused by lack of training or supervision is normally required before lack of supervision constitutes deliberate indifference. *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998). Under ratification theory, a single incident that is an "obvious violation of clearly established law" attaches liability when ratified by policymakers. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009).

Ratification theory is limited to "extreme factual situations." *Snyder*, 142 F.3d at 797-98, citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). For example, in *Grandstaff*, officers pursuing a fleeing suspect "poured" gunfire into a slowly moving truck "without awaiting any hostile act or sound," killing an innocent man. *Grandstaff*, 767 F.2d at 168.  "The disposition of the policymaker may be inferred from his conduct after the event." *Id*. at 171.

### f.   Failure to Render Medical Aid

Failure to render medical aid requires (1) deliberate indifference; (2) which results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Both the deliberate indifference and substantial harm are necessary elements.  Plaintiff must provide evidence that the delay in medical care worsened an injury or caused further harm.

## IV.   HARRISON COUNTY

With respect to Harrison County, Plaintiff's Fifth Amended Complaint asserts a cause of action under 42 U.S.C. § 1983 for violation of Fourth Amendment rights. (Dkt. No. 84 at 10). These claims include (1) failure to adopt proper policies and to train officers on the use of force, use of a taser, and in conducting a welfare check on individuals with mental illness, (2) failure to train deputies regarding emergency medical care, (3) failure to supervise or discipline deputies for excessive force, which amounts to ratification of improper conduct, and (4) failure to render medical aid. *Id*. at 10-17.

The facts that Harrison County presents, and the citations to supporting evidence, are outlined in the Harrison County MSJ. (Dkt. No. 100 at 1-10). The facts that Plaintiff presents, and the citations to supporting evidence, are outlined in the Response to Defendant Jeff McAndrews' Motion for Summary Judgment (Dkt. No. 119 at 3-7) and are incorporated by reference in Plaintiff's response to the Harrison County MSJ. (Dkt. No. 120 at 4).

### a.   County Liability Arising from Underlying Fourth Amendment Violation For Excessive Force

County liability under § 1983 requires (1) an official policy; (2) promulgated by a final policymaker; (3) that is a moving force behind the violation of the constitutional right. *Monell*, 436 U.S. at 694. There must be a constitutional right violation for an official policy to be the

moving force behind the violation. If there is no underlying Fourth Amendment violation, Harrison County cannot be liable.

If Mr. McAfee had control of the taser, he could arguably present a threat via the capability of immobilizing Sgt. McAndrews and seizing and using his firearm. If Mr. McAfee did not have control of the taser, and considering his age and fitness relative to Sgt. McAndrews, he might not be capable of seizing and using the firearm. Accordingly, the Court identifies Mr. McAfee's possession and control of the taser as a material fact.

Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. Harrison County cites the Texas Ranger investigative reports as evidence that Mr. McAfee grabbed Sgt. McAndrews' taser and gained control of the taser. (Dkt. No. 100 at 5). Lorine McAfee, in her interview with Ranger Mason, stated that something was on the ground, she thought it was the taser but wasn't sure if it was the taser or glasses, and that she moved it toward the bathroom door before the shooting, beyond the reach of her brother. (Dkt. No. 120 Ex. C-3 at 16:48-17:03).  The investigative report of the Texas Rangers shows that, after the shooting, the taser was on the floor in the hallway near the back door.  (Dkt. No. 101-3 at 24).

Even at the summary judgment stage, greater weight is assigned to video recordings taken at the scene. *Carnaby*, 636 F.3d at 187, citing *Scott*, 550 U.S. at 372. After reviewing the video from Sgt. McAndrews' body camera, it is not clear from the video where the taser was or who had control over it. At 10:19:34 through 10:19:44, there is a rapid rattling sound that a reasonable jury could find was the taser operating in "drive-stun" mode. (Dkt. No. 100 Ex. B at 10:19:34-44). Inaudible yelling can also be heard during this period. *Id*. A pair of booms that a reasonable jury

could interpret as gunshots occur at 10:19:44, and the rapid rattling sound stops. *Id.* The video is mostly black during this period, and it is impossible to determine who had possession of the taser.

This factual controversy is resolved in favor of the nonmovant: that Mr. McAfee did not have possession and control of the taser for summary judgment purposes. With this factual controversy resolved in favor of the nonmovant, there is a possible Fourth Amendment violation by Sgt. McAndrews, and Harrison County cannot avoid liability based simply on absence of an underlying Fourth Amendment violation.

### b.  Written Policy's Facial Constitutionality

In Plaintiff's Response to Defendant Harrison County, Texas' Motion for Summary Judgment, Plaintiff asserts that the County's written policies on the use of force are facially unconstitutional. Dkt. No. 120 at 3. This allegation is not present in Plaintiff's Fifth Amended Complaint. (Dkt. No. 64-1).  As it was not raised in the pleadings, this argument is not properly before the Court and is waived.  In any event, there is neither evidence nor argument to support the claim.

### c.  Policy Absence

County liability under § 1983 requires (1) an official policy; (2) promulgated by a final policymaker; (3) that is a moving force behind the violation of the constitutional right. *Monell*, 436 U.S. at 694. The movant bears the initial burden of identifying those portions of the record it asserts demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 32.

Harrison County identifies the Affidavit of Harrison County Sheriff Tom McCool, the training records of Sgt. McAndrews, and the Affidavit of Chief Deputy Brandon Fletcher as demonstrating the absence of a genuine issue of material fact with respect to policy allegations. Dkt. No. 100 at 8-10. Harrison County then asserts that the Harrison County Sheriff's Office

("HCSO") has specific policies dealing with use of force, discipline, taser training and approval, and timely requesting emergency medical assistance when needed. *Id.*

Harrison County also asserts that the HCSO does not have a policy, custom, or practice of violating citizen's constitutional rights, and that Chief Fletcher does not know of a single incident where a Sheriff's Office Employee has subjected a citizen to improper deadly force.  Moreover, misconduct is subject to investigation and discipline, and Harrison County does not interfere with Texas Ranger investigations.  Further, while not all deputies are trained in CPR, Texas does not require that deputies be CPR trained, and McAndrews has Advanced Peace Officer Certification from TCOLE,[2] the supervising state agency. The Court finds that Harrison County has met its initial burden.

Once the initial burden is met, the nonmovant must show beyond the pleadings that specific facts exist that create a genuine issue for trial. *Little*, 37 F.3d at 1075. Dr. John Peters, Plaintiff's expert, points to several deficiencies in the County's policies.  He points to deficiencies in the County's performance evaluations, organizational atmosphere, and internal affairs investigations, but offers no evidence that any of these policy shortcomings caused the Plaintiff's harm.

Plaintiff also argues that Harrison County failed to adopt any policy guiding HCSO deputies in how to carry out their duties when they involve citizens suffering from a mental illness or disability. (Dkt. No. 84 at ¶¶ 35, 39, 48). Plaintiff argues that Dr. Peters' expert reports contain statistics regarding the frequency of mental illness, that law enforcement officers will frequently encounter such individuals, that other law enforcement agencies have incorporated mental health issues and the ADA into their core training curricula, and that the HCSO failed to follow national standards, guidelines, and recommendations with its lack of written policy about interacting with

---

[2] The Texas Commission on Law Enforcement ("TCOLE") is agreed by the parties to be the entity that sets standards for training and certification of law enforcement agencies in Texas.

the mentally ill. (Dkt. No. 120 at 9-10). In addition, Plaintiff identifies Sheriff McCool as the HCSO's policymaker. *Id.* at 10.

In its essence, this argument is about how the absence of a policy regarding interacting with the mentally ill, a policy that Sheriff McCool would promulgate, allegedly violated Mr. McAfee's constitutional rights. Independent of the inadequate training and ratification arguments, no evidence is presented to establish that the absence of any specific policy for generally interacting with the mentally ill was the moving force behind a possible violation of Mr. McAfee's Fourth Amendment rights.

The identified evidence does not define what it means to have mental illness and does not present information regarding how many mentally ill people are violent, and how difficult they are to manage.  Plaintiff is correct in noting that this does not change the fact that the County has no policy for interacting with individuals with mental illness, but more than an absence of a policy is needed to attach liability. That absence of a particular policy must be shown to have been the moving force behind a violation.

Plaintiff also argues that there was no policy expressly dealing with welfare checks.  The national model policy cited by Dr. Peters states that "through a police welfare check, law enforcement goes to the person's residence, usually along with the person who made the report. Law enforcement officers enter the residence to determine the safety of the individual."  (Dkt. No. 104-1 at 11).  That is what happened in this case, except that Dr. Peters says in his report (Dkt. No. 104-5) and his affidavit (Dkt. No. 120-8) that a proper policy would have included a requirement that a deputy not conduct a welfare check on a mentally ill person without a second officer. Defendant's expert, Chief Robert Vine, does not offer a contrary opinion on this point.

It is undisputed in this case that the dispatch call answered by Sgt. McAndrews indicated that the call involved a possibly mentally disabled person.  As is usually the case with welfare checks, there was no indication of any crime in progress or other need for immediate action. While Plaintiff's evidence in support of a policy requiring two officers to respond to a call for a welfare check on a mentally disabled person is not detailed, a reasonable jury could conclude that the resort to deadly force would not have been needed if there had been a second deputy to help control the unarmed Mr. McAfee.

Sgt. McAndrews testified that he did not request backup before the welfare check because he did not feel it was necessary.  (McAndrews depo. at 65).  He also testified that backup was not available, but the record also shows that backup arrived within just minutes after his request after the shooting.  A reasonable jury could conclude that backup would have been provided if the policy called for it, or that the welfare check could have been delayed until backup was available.

### d.  Training Adequacy

For a claim of inadequate training, plaintiffs must establish (1) inadequate training policy; (2) deliberate indifference in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury. *Benavides*, 955 F.2d at 972. Harrison County presents evidence that McAndrews' training met or exceeded all training requirements mandated by TCOLE and argues that this shows there is no deliberate indifference as a matter of law. Dkt. No. 100 at 17. Harrison County asserts that Plaintiffs have made no claim and cannot present evidence that state training requirements are an inadequate training policy. *Id*. Harrison County also asserts that there is no evidence that the training policy directly caused Plaintiff's injury. *Id.* at 17.

Plaintiff presents two arguments regarding inadequate training. Dkt. No. 84 at 10-14, 16-17. The first argument is that Harrison County failed to train its officers on the use of force, use of

a taser, and in conducting a proper welfare check with individuals with mental illness. *Id.* at 10-14. The second argument is that Harrison County failed to train its deputies regarding medical treatment for arrestees. *Id.* at 16-17. In Plaintiff's response to the Harrison County MSJ, the first argument is further divided into a failure to train deputies in how to conduct welfare checks and a failure to train officers to avoid using deadly force. Dkt. No. 120 at 14-15, 17-20.

Regarding failure to train for welfare checks, Plaintiff relies on the affidavit of Dr. Peters and excerpts from the depositions of Sgt. McAndrews and Sheriff McCool. *Id.* at 14-15. Plaintiff asserts that national career and technical training standards require training for conducting welfare checks. She argues that because Harrison County knows to a "moral certainty" that deputies will be required to conduct welfare checks, the need to train these deputies in how to safely perform welfare checks is so obvious that failure to do so is deliberate indifference. *Id.* at 14.

When a municipality relies on the minimum training required by Texas law, the plaintiff must show that "this legal minimum of training was inadequate to enable the deputies to deal with 'usual and recurring situations' faced by . . . police officers." *Benavides*, 955 F.2d at 973. While Plaintiff has evidenced that dealing with the mentally ill is statistically frequent enough to be a recurring situation, the only evidence that the TCOLE training was inadequate to enable the deputies to deal with it is the opinion of Dr. Peters. Dkt. No. 120 at 15.

"Standing alone, an expert's opinion is generally not enough to establish deliberate indifference." *Thompson*, 245 F.3d at 459, citing *City of Canton*, 489 U.S. at 390. "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Id.*, citing *Snyder*, 142 F.3d at 798-99 and *Thompkins*, 828 F.2d at 304-05. Generally, the plaintiff must demonstrate at least a pattern of similar violations. *Id.*, citing *Snyder*,

142 F.3d at 798.  The Plaintiff here offers no evidence of prior similar violations, leaving this case subject to the restrictive analysis for single incidents.  The inadequacy of training must be obvious and obviously likely to result in the particular constitutional violation alleged. *Id.*, citing *City of Canton*, 489 U.S. at 390 and *Snyder*, 142 F.3d at 799. Furthermore, the exception allowing municipal liability for a single incident is "extremely narrow." *Valle*, 613 F.3d at 542.

As of 2015, the only case in 30 years falling within this exception was a case where there was not merely inadequate training, but absolutely no training at all. *Tolan v. Cotton*, 2015 WL 5310801 at *5 (S.D. Tex. 2015), citing *Brown v. Bryan County, OK*, 219 F.3d 450, 462 (5th Cir. 2000). In that case, the court found a sheriff "had full notice of the full extent of [Deputy] Burns' exuberant and reckless background" and "his record of on-the-job conduct" which included force against "a number of arrest subjects," but the sheriff nonetheless did not train Burns at all. *Id.*

While Plaintiff argues that there was no training at all regarding dealing with mentally ill or disabled citizens, McAndrews received training for a combined total of 1337 hours. Dkt. 100 at 10 (citing Affidavit of Harrison County Sheriff Tom McCool and Training Records of Sgt. McAndrews). Although this training may not include specific training for welfare checks or dealing with the mentally ill,[3] it does include relevant training such as de-escalation techniques, cultural diversity, hostage negotiations and crisis intervention training. *Id.* This training involves dealing with many different situations, including dealing with people with mental and emotional problems. *Id.* Furthermore, "[t]he licensing and training standards established by TCOLE have been found to comply with constitutional requirements and are adequate to enable Texas peace

---

[3] The Court notes that in Dkt. No. 139 Harrison County provides a TCOLE record showing the topics that made up the Basic Peace officer Class that McAndrews took, which includes six hours of Recognizing/Interacting with Persons with Mental Illness and Retardation. However, since this evidence was not properly included in the summary judgment evidence record, the Court does not consider any information provided by this TCOLE record.

officers to deal with usual and recurring situations peace officers encounter." *Tolan*, 2015 WL at *3 (citing *Benavides*, 955 F.2d at 973).

Accordingly, the Court finds that the present case is not sufficiently comparable to *Brown* to justify the single instance exception. Further, since Harper's argument that Harrison County failed to train its deputies in how to carry out their duties in situations involving individuals with mental illness hinges on this one incident and an expert opinion, the Court finds that there is no genuine issue of material fact that would establish deliberate indifference by a failure to train.

Plaintiff does cite excerpts from the depositions of Sgt. McAndrews and Sheriff McCool, but this identified evidence merely indicates what the training policy is, not whether Sheriff McCool was deliberately indifferent in adopting those policies. The only exceptions are that Sgt. McAndrews testified that he does not know what the Americans With Disabilities Act is, and that Sheriff McCool testified that he never gave any thought to training the HCSO deputies in any way on situations where the ADA may be implicated.[4] Dkt. No. 120 at 16. These two assertions, even construed as factually correct, are insufficient to establish deliberate indifference, as there is no showing that even full training regarding the ADA could have altered these events.

Plaintiff's next argument is that Harrison County failed to train its officers to avoid using deadly force and even trained officers to use deadly force where no immediate risk of serious harm existed. *Id.* at 17. The argument asserts that "McAndrews' decision to use lethal force against an unarmed, unthreatening man not suspected of any crime" is a Fourth Amendment violation caused by the failure to train as a matter of law. Dkt. No. 120 at 18 (citing *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)).

In *Brosseau* the Court stated:

---

[4] Harper's response to the Harrison County MSJ does not provide a citation for Sheriff McCool's testimony regarding ADA implicated training. The Court assumes for present purposes that this testimony was given.

> "These cases establish that claims of excessive force are to be judged under the Fourth Amendment's 'objective unreasonableness' standard. *Id.*, at 388, 109 S.Ct. 1865.[5] Specifically with regard to deadly force, we explained in *Garner* that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S., at 11, 105 S.Ct. 1694.[6] But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."

*Brosseau*, 543 U.S. at 197-198. This raises two factual questions: whether Mr. McAfee was armed, and whether Mr. McAfee posed a threat of serious physical harm. Regarding whether Mr. McAfee was armed, the only evidence in the record that Mr. McAfee was armed with a deadly weapon was a statement by Lorine McAfee in bodycam footage that Mr. McAfee "has a knife back in his room." (Dkt. No. 100 Ex. B at 10:16:26-33). However, throughout the video there is no clear footage of Mr. McAfee with a knife. *Id.* Harrison County has not asserted that he was armed with a knife.  As noted above, there is a genuine dispute regarding whether Mr. McAfee possessed the taser.

The second question is whether Mr. McAfee posed a threat of serious physical harm. Although this factual question is in dispute, greater weight is assigned even at summary judgment to facts evidenced by video recordings taken at the scene. *Carnaby*, 636 F.3d at 187. In the bodycam video, when Mr. McAfee first charges forward, he can be clearly seen beating Lorine McAfee. (Dkt. No. 100 Ex. B at 10:17:19). Even if Mr. McAfee did not pose a threat of serious physical harm to Sgt. McAndrews at this point, a reasonable jury could conclude that he did pose a threat of serious physical harm to Lorine McAfee. While Plaintiff's statement of the law here is

---

[5] The court in *Brosseau* is citing here *Graham v. Connor*, 490 U.S. 386, 388 (1989).
[6] The court in *Brosseau* is citing here *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

correct, the application here is improper. In any event, the record does show that Sgt. McAndrews was properly trained that deadly force is limited to those situations.  (Dkt. No. 158 at 130).

The most troubling evidence concerning lack of training involves the use of the taser. Plaintiff's expert provides evidence that the taser can only induce neuro-muscular incapacitation (NMI) when it is used in "probe" mode, as opposed to "drive stun" mode. (Dkt. No. 104-1 at 6). In drive stun mode, the taser can only produce pain, not incapacitation.  While Sgt. McAndrews testified at his deposition that he experienced that pain in his hand and leg while struggling over the taser with Mr. McAfee, his justification for shooting was his fear that Mr. McAfee had the taser and could incapacitate him and thereby get his gun.  (Dkt. No. 101 at 7; McAndrews depo. at 151).  Sgt. McAndrews testified that he had removed the probe cartridge from his taser before he lost control of it.  (McAndrews depo. at 179).  While far from conclusive, Sgt. McAndrews' deposition testimony could support the conclusion that he had only one training session with a taser in his career, that it was no more recent than 2012, and that he had a very limited understanding of the taser's capacities.  (McAndrews depo. at 125, 143, 155, 158).  A reasonable jury could conclude that his decision to resort to deadly force was based on a lack of training with the taser.

The current record would support the conclusion that Harrison County, through the Sheriff, was aware that Sgt. McAndrews was not equipped with a baton or mace, and that the taser was his primary non-lethal weapon.  A reasonable jury could conclude on this record that it is highly predictable that a deputy will sometimes lose his taser in a struggle with someone he is trying to subdue.  It could also be predictable that if he loses his taser and does not fully understand the manner in which it can be used against him, he would mistakenly resort to use of his gun to protect himself from the taser.  It is therefore arguable that the failure to provide further taser training,

along the lines set forth by Plaintiff's expert, meets the deliberate indifference standard of *City of Canton*, *supra*.

### e. Supervision Adequacy and Ratification

To succeed on an inadequate supervision claim, plaintiffs must establish (1) the supervisor failed to supervise; (2) a causal link exists between the failure to supervise and the violation of rights; and (3) failure to supervise amounts to deliberate indifference. *Smith*, 158 F.3d at 911-12.

Sgt. McAndrews identifies the affidavit of Sheriff McCool and the training records of Sgt. McAndrews as evidencing that Harrison County has a discipline policy. (Dkt. No. 100 at 20). It is undisputed that Harrison County requested an independent investigation into this shooting by the Texas Rangers. *Id.*

Plaintiff asserts that Harrison County has inadequate supervision and discipline because Harrison County failed to conduct an internal investigation or discipline McAndrews. (Dkt. No. 84 at 15). This argument is, like the failure to train arguments, dependent entirely upon the affidavit of Dr. Peters. (Dkt. 120 at 23). The affidavit asserts that a thorough internal investigation "is essential to developing effective policies, procedures, rules, and regulations on the use of lethal and non-lethal force . . . ." *Id.* (Dkt. No. 120-8 at ¶12).

However, "[s]tanding alone, an expert's opinion is generally not enough to establish deliberate indifference." *Thompson*, 245 F.3d at 459 (citing *City of Canton*, 489 U.S. at 390). "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Id.* (citing *Snyder*, 142 F.3d at 798, and *Thompkins*, 828 F.2d at 304). Accordingly, deliberate indifference in this case cannot be established without relying on ratification.

Under ratification theory, a single incident that is an "obvious violation of clearly established law" attaches liability when ratified by policymakers. *World Wide Street Preachers Fellowship*, 591 F.3d at 755. Ratification theory is limited to "extreme factual situations." *Snyder*, 142 F.3d at 797 (quoting *Coon*, 780 F.2d at 1161).

The Court finds that the facts of the present case, even with all disputed facts resolved in favor of Plaintiff, are not so extreme as to invoke ratification. There is no genuine issue of material fact that would establish deliberate indifference regarding supervision or discipline.

### f.   Failure to Render Medical Aid

An actionable failure to render medical aid requires (1) deliberate indifference; (2) which results in substantial harm. *Mendoza*, 989 F.2d at 195. Defendants identify the medical opinion of Jeffrey McWilliams, M.D., an emergency medicine specialist, as evidencing that that any alleged failure to provide aid caused no harm. (Dkt. No. 100 at 23).

Defendants assert that "[e]ven if such a shooting occurred in a Level 1 hospital emergency department, the injured party would have less than a 4% chance of survival in an ideal setting with trauma nurses, emergency physicians and thoracic surgeons." (Dkt. No. 100 at 23-24). Dr. McWilliams further states in his report that "there is not a field intervention that the officer could have performed that would have altered the outcome. … CPR would be futile." (Dkt. No. 103-3).

Plaintiff argues that this has no consideration of the suffering Mr. McAfee had in the moments before his death. (Dkt. No. 120 at 25). She argues that Mr. McAfee can be heard to moan for several seconds after Sgt. McAndrews fired the shots that killed Mr. McAfee.

However, Plaintiff does not identify any evidence that CPR could have reduced the suffering Mr. McAfee had in the moments before his death. Without evidence that CPR could reduce the suffering or promote the recovery of Mr. McAfee, the failure to provide first aid does

not result in actionable harm.  The audio evidence indisputably shows that Sgt. McAndrews called for an ambulance within seconds after the shots were fired.  Mr. McAfee's suffering was already occurring due to gunshots and not attributed to lack of medical aid. In a motion for summary judgment factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.  No such evidence is submitted here, and the Court finds it most likely on this record that chest compression or CPR for the victim of a chest wound would likely have increased, not lessened, the suffering.

### g.  Bystander Claim

Plaintiff also seeks recovery for personal injuries that Lorine McAfee allegedly suffered during the incident.  It is indisputable that Ms. McAfee suffered mental trauma as a result of the killing of her brother while she was attempting, along with Sgt. McAndrews, to subdue him. However, there is no evidence that any force was directed against her by the deputy nor that she was injured in any way (other than, perhaps, by her brother).   All of the evidence, including particularly the long interview with Ranger Mason and the body camera video from Deputy Castillo, shows that she was physically uninjured after the shooting.

There is "no constitutional right to be free from witnessing [] police action." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985). An additional party at the location of police action may have their own Fourth Amendment violation claims if they were not merely bystanders but also experienced injury resulting from the officer's conduct toward them. *Petta v. Rivera*, 143 F.3d 895, 902 (5th Cir. 1998).

Plaintiff points to the opinion of the Fifth Circuit in *Petta*, where an officer beat on and shot at a car in which the plaintiff children were passengers.  The children were physically uninjured but the Court found that they stated a claim (under post-1990 jurisprudence) for

excessive force because the force was directed at them (as well as at their mother, the driver) and the force was "grossly disproportionate to the need for action" and "inspired by malice," amounting "to an abuse of official power that shocks the conscience." *Id*. at 902.  Similarly, in *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986), the Court distinguished between the rights of the mother, who stood outside the trailer while the deputies shot into it, and the daughter, who was inside the trailer with the father who the deputies were shooting at.  Plaintiff has not pointed to any case in which someone was found entitled to sue when they were not physically injured, they were not the person against whom force was directed, and the force used was not so grossly disproportionate to the need as to seem inspired by malice and shocking the conscience. Accordingly, the Defendants' motions for summary judgment are granted as to the claims of Lorine McAfee.

### h.  Conclusion

As to Harrison County, Plaintiff has presented summary judgment evidence supporting two claims:  (1) whether the policy of allowing a single deputy to respond to a call for a welfare check regarding a mentally ill person was the moving force behind a use of excessive force against Mr. McAfee, and (2) whether a deliberately indifferent failure to provide adequate training on the use of a taser directly caused a use of excessive force against Mr. McAfee.  The County's motion for summary judgment (Dkt. No. 100) is denied as to those claims and granted as to all others.

### V.   SGT. McANDREWS

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

In resolving questions of qualified immunity at the summary judgment stage, the district court engages in a two-pronged inquiry. The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Id.* at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope*, 536 U.S. at 739 (quoting *Harlow*, 457 U.S. at 818).

"[T]he salient question . . . is whether the state of the law" at the time of an incident gave defendants "fair warning that their alleged [conduct] was unconstitutional." *Id.* at 741. "[N]o immunity is available for official acts when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 746 (quoting *Saucier*, 533 U.S. at 202).

A qualified immunity defense alters the usual summary judgment burden of proof. Once the defense is pleaded, the burden shifts to the plaintiff, who must rebut the defense by establishing at least a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citing *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)). Thus, "qualified immunity cases illustrate the importance of drawing inferences in favor of the nonmovant." *Id.* (citing *Tolan*, 572 U.S. at 657).

The Supreme Court held in *Tennessee v. Garner,* 471 U.S. 1, 11 (1985), that "the use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that

the suspect poses a threat of serious physical harm, either to the officer or to others.'"  Further, "it is well-established that 'the excessive force inquiry is confined to whether the [officers or other persons were] in danger at the moment of the threat that resulted in the [officers' use of deadly force]."  *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir., 2020).

If the facts are as Plaintiff asserts, relying on the statement of Lorine McAfee and the location of the taser after the shooting,[7] then Mr. McAfee did not pose a threat of serious physical harm to anyone at the time he was shot.  Lorine McAfee states that Mr. McAfee was on his back with her arms wrapped around his legs, with Sgt. McAndrews above them both, when the shots were fired.  She also states that the taser was off to the side, not in her brother's hands.  Plaintiff's evidence describes Mr. McAfee as needing a walker, an elderly disabled man.  On the other hand, Sgt. McAndrews testified that Mr. McAfee had wrestled free and was getting to his feet with the taser in one hand and the other grabbing for the deputy's pistol.

Determining which of these competing scenarios is most accurate will require the weighing of evidence, a function that is reserved to the jury.  The Court finds that if a jury accepts Plaintiff's version of the facts as true, during the two minutes not shown on the body camera video, the jury could conclude that Sgt. McAndrews violated Mr. McAfee's clearly established right to be free from excessive force.  As the Fifth Circuit noted in its *en banc* opinion in *Cole v. Carson*, 935 F.3d 444, 447 (5th Cir. 2019) (*en banc*):  "We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the … excessive-force claim."

---

[7] The Texas Rangers found the taser "on the floor near the back door," which was in the hallway outside Mr. McAfee's bedroom.  The bloodstain, where he fell after being shot, was inside the bedroom that the hallway led into.  (Dkt. No. 100-3 at 26).

Accordingly, the motion for summary judgment of qualified immunity by Sgt. McAndrews

(Dkt. No. 101) is denied.

**SIGNED this 6th day of November, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE